**UNITED STATES of America, Plaintiff–Appellee,**

v.

**John Ray BONDS (91–3610); Mark Verdi (91–3609); and Steven Wayne Yee (91–3608), Defendants–Appellants.**

Nos. 91–3608, 91–3609, 91–3610.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 11, 1993.

Decided March 4, 1994 *.

* This order was originally issued as an "unpublished order" filed on March 4, 1994. The court has now designated the order as one recommended for full-text publication.

James R. Wooley, Asst. U.S. Atty. (argued and briefed), Craig S. Morford, Cleveland, OH, for plaintiff-appellee.

Ronald L. Kuby (argued), William M. Kunstler (argued), Peter J. Neufeld, Barry C. Scheck (argued and briefed), Benjamin Cardozo School of Law, New York City, for defendants-appellants.

Before: BOGGS, Circuit Judge.

## ORDER

The underlying case involved in this appeal stemmed from a murder in which a significant issue was whether blood found at the crime scene had come from the defendant John Bonds. An extensive hearing was held before Magistrate Judge James G. Carr, concluding on September 10, 1990, on the issue of whether evidence of similarities in the DNA in the blood at the crime scene and blood from the defendant could be introduced. The evidence was held admissible by the district court on January 10, 1991, 134 F.R.D. 161 (N.D.Ohio 1991), and defendants were ultimately convicted.

On July 1, 1991, the notice of appeal was filed in this case. On August 10, 1992, before any panel had been assigned to hear the case, counsel for the plaintiffs, including Messrs. Barry Scheck and Peter Neufeld, filed a motion asking that I recuse myself from consideration of this case. As I was not assigned to the panel hearing this case, I had no occasion to rule on this matter before now. On December 15, 1993, a panel of this court affirmed the convictions of the appellants in this case. Counsel for the appellants filed a petition for rehearing with a suggestion for rehearing en banc on December 30, 1993. Thus, this matter now has come before me as a member of the entire court to which the petition for rehearing en banc has been submitted. After careful consideration of the matters raised, I decline to recuse myself from consideration of this matter and set out below my reasons for this decision.

The fundamental basis of the motion to recuse is my attendance at a March 1991 scholarly conference sponsored by the Uni-

versity of California at Riverside on the subject of Forensic Uses of DNA, and some auxiliary allegations as to my conversations during that conference. To be specific, the motion, in the form of an affidavit by Mr. Scheck, states:

7. Most importantly, Dr. Bruce Budowle, the chief scientist at the FBI's DNA laboratory, devoted much time in his presentations explicitly defending his own testimony at the *Yee Frye* hearing and the FBI's DNA methods generally. Dr. Budowle addressed the meeting three times, more than any other speaker.

. . . . .

9. Dr. Budowle not only rehashed his own. *Yee* testimony, but he presented to Judge Boggs and other attendees, *new* data that neither he nor any other prosecution witness had presented in court at the *Yee Frye* hearing.

. . . . .

11. ... Budowle's presentations alone subjected Judge Boggs to substantial, detailed, and continuous extra-judicial information of disputed evidentiary facts concerning the 'actual *Frye* hearing in *Yee*. We also saw Judge Boggs engaged in informal discussion with Dr. Budowle and other members of the FBI laboratory during the course of the conference.

. . . . .

13. The atmosphere at the Riverside Conference was highly partisan, one-sided, and, at times, vituperative. The forensic scientists who spoke were either employees of laboratories using the forensic methods employed by the FBI in the *Yee* case, or were individuals who had appeared as witnesses for and worked with the forensic laboratories. Although a few lawyers attended the conference, the audience was comprised largely of crime laboratory personnel.

14. Finally, it must be noted that there were a number of *ad hominem* attacks, many during the formal talks, that were directed at Mr. Neufeld and myself, by FBI employees and prosecutors.

. . . . .

17. Moreover, I expressed concern to Judge Boggs that he was spending time with Dr. Budowle and other members of the FBI DNA laboratory during the conference (at lunches and breaks), and such associations would make it difficult for him to be completely unbiased and impartial if he were to sit on the panel that heard the *Yee* appeal. . . .

. . . . .

20. Finally, it should also be noted that in the fall of 1988, Judge Boggs attended a three day retreat for three dozen invited guests at an estate in New York operated by the Banbury Center, Cold Spring Harbor Laboratory, on the subject of forensic DNA testing. I attended that meeting for one day and my co-counsel, Peter Neufeld, was there for all three days. Dr. Budowle and his superior at the FBI laboratory, John Hicks, were also in attendance. Two other prosecution witnesses in the *Yee* case, Dr. Caskey and Dr. Kidd, also participated in the Banbury retreat.

■ To summarize, the allegation is that, with apologies to Chesterton and Hitchcock, I am "The Judge who Knew Too Much." Without necessarily agreeing that the characterization is correct, I believe that the law is clear that a judge's interest or expertise in a given area, or his methods of informing himself as to a given area of the law, do not constitute grounds for recusal unless they come within some other, specific grounds for recusal.

To amplify this point, I will set out briefly my involvement in the area of DNA technology and identification.

In the course of general discussion in 1988 with a friend and college classmate, Professor Joel Cohen of Rockefeller University, I became interested in some mathematical work he was doing on DNA identification and had occasion to comment on a paper on which he was working. He was subsequently kind enough to give me an appropriately modest mention in this article (which was introduced as defendant's Exhibit FF at the hearing before Magistrate Carr) and in a subsequent one. *See* Cohen, *DNA Fingerprinting for Forensic Identification*, Am. J.

Hum. Genet. 46:358–368, at 367 (1990); Slimowitz and Cohen, *Violations of the Ceiling Principle: Exact Conditions and Statistical Evidence,* Am. J. Hum. Genet. 53:314–323, at 323 (1993).

A short time later, I was invited to attend a conference on DNA at Cold Spring Harbor Laboratory, in the fall of 1988. I had originally thought that this invitation had come because of my connection with Professor Cohen, but it developed that it was generated wholly independently, apparently because of a prior connection with some of the organizers in the Office of Technology Assessment of the United States Congress. My participation in that conference, which attracted a wide variety of scholars, medical researchers, lawyers and others, is recorded in *Banbury Report 32: DNA Technology and Forensic Science.* I was asked to deliver a summary of the conference, which I did and which is recorded at pages 347–52 of that volume.

About two years went by, and I received an invitation from Professor Irwin Sherman, Professor of Zoology, to speak at the above-mentioned conference at the University of California at Riverside. Apparently this invitation came about because of my participation in the Banbury Conference and because the organizers of the Riverside Conference had read my talk.

Contrary to the allegations in the motion, I spent no more time talking to Mr. Budowle than to anyone else, and in fact have no specific recollection of any conversation with him, though such a conversation certainly may have occurred, as did similar conversations with many participants at the conference. I am certain that I have had longer conversations with both counsel making the motion than I did with Mr. Budowle, and that I could pick them out of a line-up more easily, than I could Mr. Budowle.

In particular, none of the material presented at the conference, whatever adjectives may be applied to it, constituted extra-judicial *knowledge* of disputed facts. At most, it amounted to an attempt, on the part of many speakers, to "spin" facts and evidence which, even to the extent they applied to the particular *Yee* case, had already been frozen into the record sometime before. Under these circumstances, what occurred, even taking the most extravagant view, was not meaningfully different than what occurs when an appellate judge reads newspaper articles, magazines, or books that may relate to a case that may come before him. Thus, for example, in controversial cases such as the Tennessee School Book case (*Mozert v. Hawkins County Bd. of Educ.,* 827 F.2d 1058 (6th Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988)), or the menorah cases (*Congregation Lubavitch v. City of Cincinnati,* 923 F.2d 458 (6th Cir. 1991); *Americans United for Separation of Church and State v. City of Grand Rapids,* 980 F.2d 1538 (1992) (en banc)), news media, to which we all had access, carried many articles purporting to tell "facts" that may have been relevant to those cases. In a similar manner, in the field of DNA, *Science* and *Scientific American,* both of which I read, have carried numerous articles concerning the theories and findings of various people who testified on both sides at the *Yee* hearing. *See, e.g., Geneticists Attack NRC Report as Scientifically Flawed, Science,* Vol. 259, p. 755 (Feb. 5, 1993); *DNA Fingerprinting, Science,* Vol. 256, p. 300 (April 17, 1992); *Pointing Fingers: DNA Identification is Called into Question, Scientific American,* Vol. 266, p. 26 (March 1992); and *Lewontin and Hartl, Science,* Vol. 255, p. 1745 (Dec. 20, 1991).

Although my own perception was that the positions of all participants in the conference were presented ably, albeit at times warmly, and that the degree of vituperation was approximately similar from various points of view, I recognize that the perceptions of others could differ. However, a judge should never be reluctant to inform himself on a general subject matter area, or participate in conferences relative to any area of the law, for fear that the sources of information might later be assailed as "one sided." Just as a judge's personal reading list is not subject to monitoring and condemnation on that basis, neither is the speaker's list at a conference that the judge may attend.

The major case concerning a judge's attendance at a conference involved a situation far different than that involved in this case.

In the case of *In re School Asbestos Litigation*, 977 F.2d 764 (3d Cir.1992), the Third Circuit held that a district judge was required to recuse himself where the district judge:

> attended a predominantly pro-plaintiff conference on a key merits issue; the conference was indirectly sponsored by the plaintiffs, *largely with funding that he himself had approved;* and his expenses were largely defrayed by the conference sponsors *with those same court-approved funds.* Moreover, he was, in his own words, exposed to a Hollywood-style "pre-screening" of the plaintiffs' case: thirteen of the eighteen expert witnesses the plaintiffs were intending to call gave presentations very similar to *what they expected to say at trial.*

*Id.* at 782 (emphasis added).

In the case at hand, the conference was sponsored by a major university, and the judge in question had no part whatsoever in the organizing or funding of the conference. Because of the nature of an appellate case, there was no "pre-screening" of evidentiary matters to be presented to the court: all evidentiary matters by this time had been fixed in the record. To the extent, if at all, that the conference presented various positions on further developments in DNA technology, this did not constitute personal knowledge of disputed evidentiary facts, any more than would a Supreme Court Justice reading a law review article on a study of bias in the application of the death penalty before considering *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), or a judge attending a civil liberties conference and hearing Professor Stanley Fish speak before ruling on a First Amendment case. *See* Stanley Fish, *There's No Such Thing as Free Speech ... and it's a good thing, too* (1994).

■ The law on this issue, as set out in 28 U.S.C. § 455 and in cases such as *Roberts v. Bailar*, 625 F.2d 125, 129 (6th Cir.1980), requires "disqualification" of a judge when the judge has personal knowledge of disputed evidentiary facts (§ 455(b)(1)) or when a reasonable person, knowing all the facts, might reasonably question his impartiality (§ 455(a)). Based on the facts above, a reasonable person would not doubt my impartiality. An unreasonable person could focus on one aspect or another of things I have read or said, persons to whom I have talked, or articles in which I have been credited. However, a reasonable person, looking at all of the facts, would say that I am interested in the subject matter area, and no more.

■ There is no case holding that a judge acquires extra-judicial knowledge of disputed facts by hearing or reading what a witness or counsel says about what has already been put into the record of a case going up on appeal. Were this the case, we would all be required to cancel our subscriptions to law reviews and newspapers, let alone specialized journals of any sort.

In short, the motion both proves too much and too little. To the extent that a judge remains interested at all in the events of society, a judge will inevitably be exposed to matters relating, in greater or lesser degree, to interesting areas of the law on which the judge may be called to rule. However, such general knowledge does not constitute extra-judicial knowledge of disputed evidentiary facts. To the extent that the motion attempts to insinuate a particular closeness by this judge to one participant or another in the conference, as indicated above, it is simply not accurate. Nor does past participation in conferences such as the Banbury Conference, even when that participation is recorded in print, indicate bias or extra-judicial knowledge, any more than the fact that a judge has written previous law review articles or opinions in a certain field. It is, in fact, ironic that it was the defendants, who are making this motion, who introduced as evidence the Cohen article, with which I had much more personal involvement than anything I did in listening to any of the various presentations made by others during the conference.

For all of these reasons, recusal is not warranted in this case, and I therefore participated, to the same extent as other judges on the court, in the consideration of the

petition for rehearing en banc filed in the above-captioned case.