**In the Matter of James R. EDGAR, Governor of Illinois, and Ann Patla, Director of the Department of Mental Health and Developmental Disabilities, Petitioners,**

v.

**K.L., et al., Respondents.**

**No. 96–2641.**

United States Court of Appeals, Seventh Circuit.

Submitted July 15, 1996.

Decided July 18, 1996.

Order Denying Rehearing and Rejecting Rehearing En Banc Aug. 14, 1996.

Joel G. Chefitz, Timothy J. Patenode, Katten, Muchin & Zavis, Chicago, IL, for Petitioners.

Steven J. Roeder, Hedlund & Hanley, Chicago, IL, for Respondent.

Harvey M. Grossman, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, for Parties-in-Interest.

Before CUMMINGS, BAUER, and EASTERBROOK, Circuit Judges.

PER CURIAM.

Plaintiffs in this class action contend that the mental health care system of Illinois violates the Constitution of the United States. With the consent of the parties, the district judge appointed a panel of three experts to investigate the state's institutions and programs. The panel's charge permits its members and aides to meet with patients and state employees outside the presence of counsel, for otherwise they could not collect reliable data. Later the panel began to meet in private with the judge, without such a compelling reason. When defendants learned that one of these meetings, which lasted 3½ hours on September 7, 1994, was dedicated to giving the judge a preview of the panel's conclusions, and to persuading the judge that the panel's methodology was sound, defendants asked the judge to disqualify himself under 28 U.S.C. § 455. The judge declined, and this petition for a writ of mandamus followed.

Plaintiffs believe that the defendants waited too long (trial is set for next month) to seek disqualification. Delay can be fatal, although after *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988), passage of time is not conclusive if the justification for disqualification is compelling. Compare *United States v. Murphy*, 768 F.2d 1518, 1539 (7th Cir.1985), with *SCA Services, Inc. v. Morgan*, 557 F.2d 110, 117–18 (7th Cir. 1977). Although the defendants have known for at least a year that the experts met from time to time with the judge, the judge described these occasions as administrative and "social". Not until two weeks before seeking

disqualification did the defendants learn—by acquiring a detailed agenda prepared by one of the panel members—that at least one meeting had covered the merits of the case, rather than casual chitchat and details such as reimbursement of expenses. Defendants sought to learn more about what had happened at the September 7 meeting, but the judge forbade inquiry. He quashed subpoenas issued to the participants, and he invoked what he called a "judicial privilege" to shield what had been said. Thus all we have are possibilities. But these possibilities justify a request for emergency relief. See *United States v. Balistrieri*, 779 F.2d 1191, 1204–05 (7th Cir.1985); *Pepsico, Inc. v. McMillen*, 764 F.2d 458, 460 (7th Cir.1985). Indeed, we have held, parties who know of a problem under § 455 but permit the trial to occur may not seek relief later. *Murphy*, 768 F.2d at 1539–41. Defendants' request is timely.

█ Whether the meeting was a disqualifying event depends on what transpired. Canon 3A(4) of the Code of Conduct for United States Judges provides: "A judge should ... except as authorized by law, neither initiate nor consider *ex parte* communications on the merits, or procedures affecting the merits, of a pending or impending proceeding." Did any meeting between judge and experts touch the merits, or procedures affecting the merits? We cannot know, because the district judge has blocked discovery from other participants and has declined to state on the record his own memories of what happened. The judge did not elaborate on the nature, extent, or legal support for his claim of "judicial privilege," but a phrase of that kind usually refers to the deliberative process. No privilege covers arrangement of administrative details, such as where an expert witness will stay while doing research or who will provide computer time to analyze the data. To invoke a privilege is therefore to confess that the discussions covered the substance of potential testimony and the conduct of the litigation—and if this is not so in fact, it is nonetheless what we must assume, because no evidence in the record undermines the inferences naturally to be drawn from the outline for the September 7 meeting. The outline enumerates "three irreducible obligations of the modern state hospital"

and ticks off (in a section captioned "General Findings") numerous ways in which the panel believes Illinois falls short. This outline covers subjects at the core of the litigation; indeed, it served the panel as the draft outline for its final report.

Defendants believe that a private briefing on the merits leads to disqualification under 28 U.S.C. § 455(b), which provides that a judge must "disqualify himself in the following circumstances: (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding". Defendants contend that the experts imparted to the judge "personal knowledge of disputed evidentiary facts". Plaintiffs have two replies: first, that the private meetings were authorized by the parties' consent reflected in the agreed order appointing the panel; second, that disclosures in chambers are not "personal" knowledge. Neither of these is sound.

Let us suppose that the parties consented to private investigation by the judge. That consent would be ineffectual under 28 U.S.C. § 455(e): "No justice, judge, or magistrate shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b)." What is more, there was no such consent. Early drafts of the order appointing the experts and a professor of law who was called "the Manager" provided that "[t]he Panel and Manager may communicate with the Court at any time without the inclusion of counsel." This language was deleted before the order was entered. According to plaintiffs, it was deleted as redundant in light of ¶ 3 of the order, which reads:

(a) The Manager and the [Manager's] Assistant shall coordinate and facilitate the investigation and reports of the Panel. In addition to the other duties specifically stated in this Order, the Manager and the Assistant will obtain and coordinate access for the Panel to DMHDD [Department of Mental Health and Developmental Disabilities] mental health centers and other facilities, programs and agencies, facilitate the Panel's collection of other information, fa-

cilitate communication between Panel members, as requested, make travel and lodging arrangements for the Panel, and report to the Court and the parties as to the progress and status of the Panel's investigation.

(b) By appointing the Manager, the Court is not relinquishing its exclusive prerogative to instruct the Panel regarding the applicable law or the appropriate focus of or limits to either the Panel's investigation or the opinions to be expressed in its report.

Paragraph 3(a) permits the Manager to "report to the Court and the parties", not to report to the judge in secret, and it does not even hint that the experts (who were likely to become witnesses) may meet privately with the judge. Paragraph 3(b), on which plaintiffs lay principal stress, states that the judge may direct the experts, but again it does not say or imply that the judge may receive information and deliver instructions in secret. Rule 706(a) of the Federal Rules of Evidence specifies the right way: "A witness so appointed [by the court] shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate." This places the substance of the instructions on the record and ensures that the parties know what is happening and can make appropriate suggestions, motions, and objections. The judge has not attempted to reconcile with Canon 3A(4) or Rule 706(a) the procedure he used in this case.

As for the question whether information secured in chambers can be "personal" knowledge: although § 455 is principally concerned with knowledge that is "extrajudicial" in the sense that the judge acquires it outside a courthouse, see *Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994), the Court rejected the argument that *only* such information can lead to disqualification. *Id.* at ——, 114 S.Ct. at 1157. The point of distinguishing between "personal knowledge" and knowledge gained in a judicial capacity is that information from the latter source enters the record and may be controverted or tested by the tools of the adversary process. Knowledge received in other ways, which can be neither accurately stated nor fully tested, is "extrajudicial." Thus information a judge learns at a workshop devoted to a subject is extrajudicial, *In re School Asbestos Litigation,* 977 F.2d 764 (3d Cir.1992); *Hathcock v. Navistar International Transportation Corp.,* 53 F.3d 36, 41 & n. 4 (4th Cir.1995), even though the workshop is open to other persons, and evidence could be taken about the proceedings. Off-the-record briefings in chambers, by contrast, leave no trace in the record—and in this case the judge has forbidden any attempt at reconstruction. What information passed to the judge, and how reliable it may have been, are now unknowable. This is "personal" knowledge no less than if the judge had decided to take an undercover tour of a mental institution to see how the patients were treated. Instead of going himself, this judge appointed agents, who made a private report of how they investigated and what they had learned. Mandatory disqualification under § 455(b)(1) follows.

*Bradley v. Milliken,* 620 F.2d 1143, 1157 (6th Cir.1980), on which plaintiffs rely, is not to the contrary. That case did not deal with § 455(b)(1) and did not approve *ex parte* meetings with expert witnesses scheduled to testify at trial; instead the court addressed a post-trial meeting between the judge and a political body that would be charged with implementing the relief. Even so the court denied a motion for disqualification under 28 U.S.C. § 455(a) only because it applied a rule limiting disqualification to extrajudicial activities—a rule the Supreme Court has since disapproved.

Although an over-strict reading of § 455(b)(1) could lead to injustice by disqualifying a judge for learning a trivial fact in mid-trial of an extended case, the activities here do not present that specter. The discussions in chambers were calculated, material, and wholly unnecessary. Indeed, we believe that disqualification is independently required by 28 U.S.C. § 455(a), which provides: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." A

thoughtful observer aware of all the facts (the standard under § 455(a), see *Liljeberg*, 486 U.S. at 865, 108 S.Ct. at 2205; *In re Mason*, 916 F.2d 384 (7th Cir.1990); *In re National Union Fire Insurance Co.*, 839 F.2d 1226 (7th Cir.1988); *New York City Housing Development Corp. v. Hart*, 796 F.2d 976 (7th Cir.1986)), would conclude that a preview of evidence by a panel of experts who had become partisans carries an unacceptable potential for compromising impartiality.

By September 1994 the panel's two remaining experts were loudly denouncing Illinois' mental health system. By their own admission, the members of the panel decided to use an unorthodox approach, potentially open to challenge under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Methodology was among the subjects of the private meetings, and an objective observer would be concerned that the judge had given the panel's procedure his blessing, in secret and without adversarial input. After defendants filed their motion for disqualification, the judge justified his meetings with the panel precisely on the ground that the meetings would enable him to ensure that the panel's report was admissible—that is to say, the judge offered as justification for an *ex parte* meeting the need to anticipate and preempt an important legal question. Although in open court the judge assured defendants that he would have an open mind if they later pressed a *Daubert* objection, an objective observer would doubt that this opportunity was adequate—for defendants would be challenging the judge as well as the panel.

Other proceedings lend credence to a concern that the judge and the experts became excessively cozy as a result of these meetings. For example, the judge has expressed confidence that the panel's report is invulnerable to challenge. When defendants asserted that the panel's report contains conclusions about which reasonable persons could differ, the judge replied: "There are no conclusions in that report" and gave some examples, including this one:

Then [the report] says: "(1) An ubiquitous lack of sophisticated clinical leadership that could have assisted the staff in addressing the internal issues that were torturing their patients and that often led to repeated hospitalizations." That's an assertion of fact.

Although the judge saw only "fact" in this passage, we see one conclusion piled on another. Was the clinical leadership "unsophisticated"? Could "sophisticated clinical leadership" have done anything about the "internal issues that were torturing [the] patients"? Would better treatment have reduced the number of repeated hospitalizations? These propositions, and the methodology that led to them, may be contested at trial. But the judge has announced that they are incontestable.

Additional statements by the judge also would cause a reasonable observer to be seriously concerned about the court's ability to conduct the trial impartially. For example, in July 1995 the Mental Health Association of Illinois (MHAI), an advocacy group, sent the judge a letter expressing its opinion that the state's facilities and programs needed immediate improvement, and asking the judge to release the panel's report to the public so that it could be used in lobbying efforts. MHAI sent a copy of this letter to plaintiffs' counsel, but not to defendants' counsel. After consulting the Manager, the judge replied with a letter that reads, in part: "In due time, we hope we will achieve some significant results." A reasonable observer would hear this as an assertion—long in advance of trial—that the state's institutions and programs violate the Constitution, and that a remedial order is forthcoming. The judge sent his letter to MHAI, to plaintiffs' counsel, and to a lobbyist; defendants' counsel was left in the dark.

So convinced was the judge of the merit of plaintiffs' case that he demanded significant concessions in settlement negotiations. The judge was dismayed that the persons negotiating on behalf of the defendants did not include the Governor of Illinois. The judge told counsel for defendants that they had to produce high executive officials, because even the Director of the DMHDD does not "really

know how bad things are." The judge assured counsel that the Governor would be well received although "when the Governor knew me, he was a gofer in the [state] Legislature and I was a very active and vocal legislator." When the Governor declined to attend the settlement negotiations, the judge inquired:

> Do you know how many cases that I have in this courtroom right now that the Governor is very, very concerned with? Do you?
>
> [Counsel]: I imagine a few.
>
> The Court: Well, you're supposed to be responsible for everyone who wants to talk to the Governor. You should know that the recent revenue bill is up here for a preliminary injunction within weeks, including hundreds of millions of dollars, they tell me, or many millions of dollars of revenue to the state of Illinois. Does that mean that I'm not important to the Governor or that somehow or other I'm being pretentious?

A month later, court and counsel had this exchange:

> [Counsel]: Your Honor, the governor cannot afford to set a precedent of getting involved personally in every case in which he is named in his official capacity. He told me, and I have never counted it up, that there are hundreds, if not thousands, of such cases.
>
> The Court: I know that counsel, and I don't think there are three that are more important than this one, and I probably have the other two. Maybe there are other judges that have them. But the point is this is a massively important case to the people of Illinois, okay? Now, the governor is the governor of Illinois and he is being sued. You say it's only in his official capacity. Okay, in his official capacity I want to talk to him. Now, if I have to, I'll subpoena him and I'll set a precedent, okay? And if nothing else, I'll insist that he be a witness in this courtroom if I don't get to talk to him, and then I will ask him questions under oath in the courtroom.

The judge relented after recognizing that he lacks authority to hale the Governor into court. (No one contends that the Governor

is a fact witness.) But a reasonable observer could read these exchanges as veiled threats to decide not only this case, but also other pending cases, against the State of Illinois as a penalty for the Governor's unwillingness to appear. An inclination to retaliate when crossed also is manifest in the comment that defendants would be in "deep doo" if the motion for disqualification failed. The impartiality of a judge who makes such statements may reasonably be questioned, whether or not the judge planned to carry through.

What we have seen in this record persuades us not only that the district judge is disqualified, but also that the panel can no longer claim the mantle of judicial appointment. The panel has been influenced by secret submissions from advocacy groups and counsel supporting plaintiffs in other litigation against Illinois. One of the two remaining experts on the panel, Dr. Robert L. Okin, has shed any pretense that he is playing a scientific role. In a letter to the district judge dated December 7, 1995, Okin asked the judge to release the panel's report so that it could serve as a "flag for advocacy groups to rally around to assert [political] pressure." (Copies of this letter were not sent to counsel.) Okin urged the judge to delay release of the report for a short time, however, because "[i]f the report is released immediately, we won't have time to meet with key editorial boards before it hits the street. Imparting an understanding of this Report to these boards is crucially important. This fight needs to be won on the street, not just in court." The letter continued:

> By the way, the legislatures' anger about consent decrees is standard fare. No legislature likes them but with the right approaches, even the most reluctant legislatures have put up the money. How loudly they gnash their teeth is irrelevant. Whether they pay is the only relevant issue. If the system is viewed as deficient and this is highly publicized, legislatures will pay, whatever the niceties of the balanced [sic] of powers.

Okin may be an expert on mental health, but he is no expert on the difference between judges and legislators, the proper relation between national and state governments, or

the "niceties of the balanced of powers." See *Evans v. Chicago,* 10 F.3d 474 (7th Cir.1993) (en banc); *B.H. v. McDonald,* 49 F.3d 294, 302–04 (7th Cir.1995). Experts appointed and supervised by a court carry special weight because of their presumed neutrality. Okin is no neutral, and neither is the panel. We leave to the discretion of the replacement judge whether plaintiffs may call members of the panel as their own witnesses, and introduce its report as their evidence, or whether the behind-the-scenes machinations make even that use imprudent.

A writ of mandamus will issue today removing the current district judge from the case and requiring its assignment to a different judge. Ancillary questions, such as whether we should stay proceedings pending the disposition of the petition for mandamus, need not be resolved.

### Order

The court treats the Suggestion for Rehearing En Banc, filed on August 1, 1996, by the judicial respondent in these proceedings, as implying a petition for rehearing by the panel. See Circuit Rule 35(c). All of the judges on the panel have voted to deny the petition. The panel notes that the judicial respondent could have filed a response to the petition for mandamus on the same schedule as the private respondent, and did not do so. His position, stated at length in an opinion denying the motion under 28 U.S.C. § 455, was fully considered by the panel.

No judge in active service has called for a vote on the suggestion of rehearing en banc, which is rejected. Circuit Judge Flaum did not participate in the consideration or decision of this case.