FUENTES, Circuit Judge,
dissenting.
In November 2001, then-Chief Judge Becker of this Court ordered the consolidation of the Five Asbestos Cases on the grounds that “these bankruptcy cases, which carry with them tens of thousands asbestos claims, need to be consolidated before a single judge so that a coordinated plan for management can be developed and implemented.” JA at 191. Judge Becker stressed the magnitude of this task, noting that because “a significant portion of the asbestos cases in this country are proceeding under the aegis of this litigation, I deem this assignment and consolidation critically important to the administration of justice.” Id. at 191-92. Judge Wolin accepted this Court’s mandate and immediately set himself to the task of managing this unprecedentedly large asbestos bankruptcy litigation. My colleagues, disapproving of the manner in which Judge Wolin executed his mandate, have decided that he must be recused.
I disagree with this conclusion for several reasons. First, I cannot concur that a reasonable observer would perceive any appearance of partiality on the part of Judge Wolin: specifically, I do not agree that the Advisors labored under any sort of conflict, nor do I perceive Judge Wolin’s practice of ex parte communications to warrant his recusal. I find it telling that Petitioners have not asked, and the majority has not seen a need, for any of Judge Wolin’s prior rulings to be disturbed. In my view, this fact belies the seriousness of the taint that Petitioners have sought to ascribe to Judge Wolin’s court. Second, the petitions for recusal in this case are clearly untimely, and should be rejected on that basis alone. Accordingly, I must respectfully dissent from my colleagues’ decision to recuse Judge Wolin.
I.
A.
First, I must disagree with my colleagues’ conclusion that Gross and Hamlin had a conflict of interest. The majority discerns that “Gross and Hamlin, did, in fact, operate under a structural conflict of *320 interest” arising “from the dual roles they played in the Five Asbestos Cases and the G-I Holdings bankruptcy.” Maj. Op. at 303. The majority agrees with Petitioners that Gross and Hamlin are conflicted by their futures representative roles because the issues in G-I overlap to such a great degree with those in the Five Asbestos Cases. Specifically, the majority writes: “By their very position as representatives of the future asbestos claimants in G-I Holdings, Gross and Hamlin signaled to all that they could not be non-partisan, benign or neutral.” Maj. Op. at 304.
There is no doubt, as the Supreme Court recognized long ago, that “[cjourts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties. This power includes authority to appoint persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause.” In re Peterson, 253 U.S. 300, 312, 40 S.Ct. 543, 64 L.Ed. 919 (1920) (Brandéis, J.) (internal citations omitted). Although “there is no statute which expressly authorizes” the appointment of the Advisors in this case, “the court possesses the inherent power to supply itself with this instrument for the administration of justice when deemed by it essential.”[31] Id. The Advisors may well have been extraordinary and unprecedented appointments in this asbestos bankruptcy proceeding, but this is a case of extraordinary and unprecedented complexity and magnitude. In that light, I cannot agree that a reasonable observer, with knowledge of all of the relevant facts, would discern their role as creating any appearance of partiality.
To see why this is true, one need only look at the role of a futures representative in asbestos bankruptcy litigation. In an asbestos bankruptcy proceeding, all present and future asbestos claims are steered away from the bankrupt debtor and applied to a properly funded trust approved by the bankruptcy court. Present asbestos litigants are those who suffer asbestos-related injury before the debtor-defendant’s Chapter 11 reorganization plan is confirmed, while future claimants are those who do not manifest any injury until after the plan is confirmed. Because asbestosis symptoms can take an extremely long time to manifest themselves, and because the whole point of Chapter 11 proceedings is to give the debtor finality as to pre-bankruptcy liabilities, future claimants are given their own “futures representative.” This representative is charged with representing the interests of future claimants, i.e., by maximizing their share of the trust corpus. Much like unnamed class members are bound to the results of a class action, a future claimant is bound by the resolution to which his or her representative agrees. By definition, future claimants are unidentified during the plan process, so the futures representative does not have any concrete clients, only a nebulous “client” comprised of latent future interests.
*321 Consequently, Gross and Hamlin do not have any clients in G-I, nor will they have any clients by the point at which their job in G-I is finished: their duty is to promote the collective interest of those parties that will have future claims against the G-I post-confirmation trust. In other words, Gross and Hamlin are charged with safeguarding future claimants’ “cut” of the G-I trust. This duty does not place Gross and Hamlin in a materially adverse position to the estates in the Five Asbestos Cases, nor does it give them a direct interest in manipulating those estates in any way. See In re Marvel Entertainment Group, Inc., 140 F.3d 463, 476 (3d Cir.1998) (“one is a 'disinterested person’ only if he has no interest that is materially adverse to a party in interest in the bankruptcy”).
Petitioners’ failure to point out any interest held by Gross or Hamlin is unsurprising, given that they do not represent any of the parties in the Five Asbestos Cases. While there may be some overlap among those who eventually share in the money set aside for future claimants in the Five Asbestos Cases and those who share in the money set aside for future claimants in G-I, the “parties” themselves-the future claimant interests-are distinct. The clear distinction between the futures claimants in G-I and those in the Five Asbestos Cases is highlighted by the facts that future claimants in the Five Asbestos Cases could be present claimants in G-I or vice versa, and that Gross and Hamlin will not even know which claimants fall into which category until their roles are concluded.
Moreover, the subject matters of the cases are entirely different. As observed before, the G-I litigation is a dispute over how to divide the assets of the G-I trust. Similarly, each of the Five Asbestos Cases is a dispute over how to divide the assets of the trust of one of the five debtors. In other words, the money at stake in G-I has no relation whatsoever to the money at stake in any of the Five Asbestos Cases, and the responsibility held by Gross and Hamlin to maximize future G-I asbestos claimants’ share of the G-I trust presents no duty with respect to the division of the trusts in the Five Asbestos Cases.
Despite the total lack of commonality among the parties and subject matter in G-I and the Five Asbestos Cases, the majority perceives the appearance of a conflict because, as an asbestos bankruptcy case, G-I contains similar issues to those in the Five Asbestos Cases.[32] In my view, this simply cannot constitute grounds for a reasonable, fully informed observer to perceive a conflict, and the majority does not explain why it would constitute such grounds. It is true that decisions from Judge Wolin benefiting future claimants in the Five Asbestos Cases might benefit the G-I future claimants, but this does not make Gross and Hamlin non-neutral as Judge Wolin’s Advisors. Any person with expertise in a given field invariably forms opinions about that field. For example, judges are • empowered to appoint attorneys as experts. It is almost certain that an expert attorney will have opinions about the matters within his or her expertise. Accordingly, it is possible, if not probable, that the attorney will have opinions about the merits of the case for which he or she is called. Furthermore, it is also possible, if not probable, that the practice upon *322 which the attorney built his or her expertise will contain clients that would be benefited by the judge’s ruling in a certain way. These are just natural consequences of the attorney being an expert in his or her field, but would not cause the reasonable observer to demand the judge’s recusal because the attorney is “conflicted.” Similarly, a judge would obviously not have to recuse himself from all criminal cases if his law clerk was committed to working for the Federal Defender after his or her clerkship. Although the law clerk would arguably have an incentive to promote pro-defendant precedent, no reasonable observer would demand that the judge screen off the law clerk from all criminal cases.
In short, there is no colorable basis for perceiving Gross and Hamlin to be “non-neutral.” They do not represent any parties in the Five Asbestos Cases, they do not directly represent any interest materially adverse to any of those parties, and the subject matter of their representation is wholly separate from the subject matter of the Five Asbestos Cases. At most, Petitioners have shown that Gross and Hamlin have opinions about the subject matter in front of them as a result of their knowledge of asbestos litigation, but strong opinions about the law are to be expected in any well-educated and well-informed judicial advisor (or judge). The majority gleans an appearance of conflict from the mere existence of similarities between the Five Asbestos Cases and G-I, but a reasonable observer with knowledge of all relevant facts[33] would easily pierce through these superficial similarities and conclude that there is no conflict.
B.
Because I find that Gross and Hamlin were not conflicted by their roles in G-I, I find it necessary to briefly discuss Petitioners’ other allegations of conflict. The second purported conflict is the attendance by Gross, Hamlin and McGovern at the futures representatives’ meetings. Petitioners assert that because the meetings included futures representatives for the Five Asbestos Cases and had as their goal the promotion of future claimants’ interests in the planning of upcoming legislation, the neutrality of the three Advisors was compromised. Attendance at a conference or meeting where a particular point of view is advocated or dominates the discussion, however, does not by itself create a reasonable question as to a judge’s impartiality. United States v. Bonds, 18 F.3d 1327, 1330-31 (6th Cir.1994). Going to such a conference creates no more of an appearance of bias than reading a law review article or book with the same viewpoint. Id. at 1330-32.
In Bonds, the criminal defendants appealed a conviction based largely on challenged DNA evidence, and then moved for rehearing en banc after losing the appeal. Id. at 1328. The defendants unsuccessfully sought the recusal of an appellate judge from the en banc panel because that judge had attended a scholarly conference in which the speakers vigorously defended *323 the FBI’s DNA methods and denigrated defense counsel challenging those methods. Id. at 1329. In refusing to grant the recusal motion, the Bonds court specifically distinguished In re School Asbestos Litig., 977 F.2d 764, 782 (3d Cir.1992), on the grounds that the conference in the latter case was actually funded by the judge in that case, and provided a pre-screening of the plaintiffs’ case on the actual facts of the case. 18 F.3d at 1330-31. This case has neither of these salient attributes, as there is no evidence that the actual facts of the Five Asbestos Cases were spun in any particular light to the Advisors. This case is therefore more like Bonds than School Asbestos.
Petitioners’ final three grounds of conflict are also unpersuasive. First, Petitioners’ argument that Gross’s advocacy for the Keene Creditors Trust created a conflict fails for the same reasons that he and Hamlin were not conflicted by them roles in G-I. Second, Petitioners allege that after Gross and McGovern acted as mediators, they divulged confidential information gathered in that capacity from the parties to Judge Wolin, and that this constituted an ethical breach of their mediator duties. The record indicates that Gross made some reports of his mediation discussions to Judge Wolin, and that McGovern did, in fact, report to the Advisors and Judge Wolin that the parties to an earlier mediation in Owens Coming disagreed on the extent of Owens Coming’s tort liability, estimating it to be anywhere from $6 to 20 billion.[34] Furthermore, McGovern has testified that disclosures of the mediation’s substance, even to the decisionmaker in the case, are an ethical breach.
At most, Petitioners have shown that McGovern and Gross may have breached their ethical duties as mediators; however, Petitioners have not shown any way in which this purported breach would actually constitute a conflict or an appearance of partiality on Judge Wolin’s part. Petitioners have no evidence that the mediations’ substance was conveyed to Judge Wolin in a manner that would bias him in the Five Asbestos Cases. Indeed, as Judge Wolin has pointed out in his opinion, the total amount of Owens Coming’s liability was not the key settlement issue in the case; rather, because the bankruptcy dispute is over the distribution of the pie rather than its size, the truly sensitive information in this case would be the parties complicated claims as to their shares of the estate.
Finally, Petitioners contend that Hamlin’s nomination as a futures representative in Grace created a conflict, and that Hamlin admitted as much. Hamlin, of course, merely observed that if he became the futures representative in Grace, he would have to leave his Advisor position. Hamlin’s observation, in fact, highlights why his role in G-I did not create a conflict here: as a Grace futures representative, he would be fighting with other creditors of Grace over the proper distribution of the Grace estate. As a G-I futures representative, in contrast, he has no direct interest in the division of the Grace estate. In conclusion, for the reasons stated above, none of Petitioners’ arguments that a conflict existed is persuasive.
C.
The majority also comments that Judge Wolin’s practice of ex parte communications contributed to an appearance of partiality: “If the structural conflicts of interest gave Gross and Hamlin a motive to give Judge Wolin less-than-neutral advice, it was the ex parte meetings that gave *324 them the opportunity.” Maj. Op. at 312. Of course, if there were no conflict to begin with, then Judge Wolin’s ex parte conferences with his Advisors were no more objectionable than any judge’s ex parte communications with his or her law clerks. Thus, the ex parte communications with the Advisors clearly did not provide any independent grounds for recusal.
While I share my colleagues’ wariness of the scope of Judge Wolin’s ex parte contacts with the parties, I do not find those contacts disturbing to the point of requiring his recusal under § 455(a). Petitioner USG’s brief implies that ex parte contacts in themselves cause a judge’s impartiality to be reasonably questioned. This blanket indictment of ex parte communications is belied by caselaw in both this Circuit and others. In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions, 278 F.3d 175, 182, n. 5 (3d Cir.2002) (stating that “any reasonable attorney would have understood that Judge Wolin could permissibly engage in ex parte communication in a complex class action” and noting recu-sal movant’s concession that premising his motion on Judge Wolin’s ex parte contacts was baseless) (internal quotations omitted); Aiken County v. BSP Div. of Envirotech Corp., 866 F.2d 661, 679 (4th Cir.1989) (recusal inquiry based on ex parte contacts must take all circumstances of contact into account).
Indeed, contrary to USG’s arguments, cases ordering recusal on the basis of ex parte contacts did so based on the contacts’ specific circumstances, not as part of some general rule against ex parte contacts. In United States v. Kelly, 888 F.2d 732, 745 (11th Cir.1989), for example, the Eleventh Circuit recused the judge in question because the judge communicated ex parte with a friend’s wife regarding the friend’s decision to testify; indeed, the judge himself conceded the appearance of impropriety. Similarly, the School Asbestos court recused a trial judge who, in his personal capacity, had unwittingly attended a conference sponsored by the plaintiffs in his case on the very topics central to his case, funded by money he had approved for plaintiffs’ fund. School Asbestos, 977 F.2d at 781-82. In that case, we ruled that all of those facts in concert, combined with the judge’s own recognition of a possible taint, warranted recusal. Id. at 782-83. In other words, the ex parte contacts in those cases possessed attributes that made them specifically vulnerable to allegations of bias.
In trying to analogize to these cases, USG makes much of the large number of ex parte contacts in this case, but does not cite to any caselaw that indicates that the quantity of contacts is a factor in determining recusal. Rather, as indicated above, courts ordering recusal examined the qualitative circumstances of the contacts and their consequences in making their decisions. In this case, Judge Wolin made his practice of using ex parte communications widely known at the outset of the bankruptcy proceedings, and the record indicates that while every single party did not participate, there was no favoritism given to any particular bloc of interests. JA at 1854-70. The only suspicious circumstance alleged by USG is that Judge Wolin issued a Case Management Order favoring USG’s position on setting a bar date, had numerous ex parte contacts with asbestos claimants’ counsel, and then “retreated” from enforcing the Case Management Order. However, the Case Management Order itself was not binding, but explicitly described itself as a proposal that was subject to comment by all interested parties, after which it might not be executed. JA at 286. In conclusion, there is nothing about the ex parte communications in this case to warrant recusal.
*325 D.
Because I would reject Petitioners’ § 455(a) challenge, I reach the § 455(b)(1) challenge as well, and conclude that the ex parte communications here do not warrant recusal under § 455(b)(1). In relevant part, 28 U.S.C. § 455(b)(1) demands a judge’s recusal when “he has ... personal knowledge of disputed evidentiary facts concerning the proceeding.” Accord, Kensington, 353 F.3d at 219, n. 6. Canvassing caselaw from various jurisdictions, Judge Wolin held that the proscribed knowledge in § 455(b)(1) does not include information gained ex parte within a judicial proceeding, generally known facts, opinions on broad topics formed outside the courtroom, or irrelevant facts. Rather, the District Court concluded, § 455(b)(1) mandates recusal if and only if “a specific, disputed fact at issue in the case was within the judge’s prior, non-judicially acquired knowledge.” JA at 104. Petitioners argue that ex parte contacts are almost entirely forbidden by § 455(b)(1). Respondents counter that the District Court’s standard was basically correct, and that § 455(b)(1) recusal is only triggered if a judge gains information on a disputed evi-dentiary fact outside of judicial proceedings, or if he shows actual bias.
As discussed above, case law in this Court casts doubt on Petitioners’ sweeping indictment of ex parte communications. See In re Prudential, 278 F.3d at 182, n. 5. Furthermore, other Circuits unanimously support Respondents’ contention that § 455(b)(1) recusal requires the “personal knowledge” to have its source outside of the matter over which the judge is presiding. Bogosian v. Woloohojian, 158 F.3d 1, 11 (1st Cir.1998) (information gained by judge “acting in a judicial capacity ... was not ‘personal’ knowledge raising a recusal question”); Conkling v. Turner, 138 F.3d 577, 592-93 (5th Cir.1998) (same); Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisc., Inc., 991 F.2d 1249, 1255-56 (7th Cir.1993) (same); Hale v. Firestone Tire & Rubber Co., 756 F.2d 1322, 1329 (8th Cir.1985) (same); United States v. Bailey, 175 F.3d 966, 969 (11th Cir.1999) (same); In re Beard, 811 F.2d 818, 829, n. 16 (4th Cir.1987) (knowledge acquired by judge through ex parte communication did not fall under § 455(b)(1) because it was acquired during “the course of his judicial duties”); United States v. Yousef, 327 F.3d 56, 170 (2d Cir.2003) (same); United States v. Flowers, 818 F.2d 464, 468-69 (6th Cir.1987) (recusal not warranted where “all the information the judge acquired about the case arose from his association with the proceeding”); In re Grand Jury 95-1, 118 F.3d 1433, 1438 (10th Cir.1997) (information must be obtained outside course of judicial proceeding, such as “by witnessing the events at issue in the proceeding”) (internal quotations omitted).
The Circuits also seem to agree with Respondents that recusal is only appropriate under § 455(b)(1) when the knowledge gained is pertinent to a specific disputed fact at issue in the case before the judge. United States v. DeTemple, 162 F.3d 279, 285 (4th Cir.1998) (judge’s knowledge of facts gained by representation of one of defendant’s prior creditors did not require recusal because none of those facts was “a disputed evidentiary fact in the criminal trial”); United States v. Smith, 210 F.3d 760, 764 (7th Cir.2000) (judge’s extrajudicial knowledge that anhydrous ammonia is a dangerous substance did not justify recu-sal from sentencing defendant even though danger posed by anhydrous ammonia was material fact at issue because danger posed was not in dispute). This Court has agreed that the “disputed evidentiary facts” described in § 455(b)(1) are “matters underlying the cause of action.” *326 Plechner v. Widener College, Inc., 569 F.2d 1250, 1263 (3d Cir.1977).
Petitioners’ attempts to establish a per se rule requiring recusal for ex -parte communications are unavailing. For example, they cite to Price Bros. Co. v. Philadelphia Gear Corp., 629 F.2d 444, 446 (6th Cir. 1980), but that case was not a recusal case, and dealt with a judge whose law clerk gathered facts through first-hand observation of the allegedly defective pipe at the heart of the lawsuit; in other words, the judge gained extrajudicial knowledge regarding a disputed fact at the heart of the litigation. The Price Bros, court explicitly stated, however, that “not every ex parte communication to the trial court” is impermissible. Id. Similarly, United States v. Craven, 239 F.3d 91 (1st Cir.2001), cited by USG, is not a recusal case either, and also stated “that not every ex parte contact between a judge and a court-appointed expert” is improper. Id. at 103, n. 3. Petitioners do cite a recusal case, Hathcock v. Navistar Int’l Transp. Co., 53 F.3d 36, 41 (4th Cir.1995), but in that case the judge was recused on § 455(a) grounds because he had plaintiffs counsel draft an opinion for him without informing opposing counsel.
The precedent most strongly urged by Petitioners as persuasive in this case is Edgar v. K.L., 93 F.3d 256 (7th Cir.1996), but even that case does not stand for the broad proposition that any information gained by the judge outside the adversarial process (i.e., ex parte) mandates recu-sal. Rather, in Edgar the recused judge sent a panel of appointed experts to personally inspect the conditions of an Illinois mental health facility that was found to be constitutionally infirm. Id. at 257. In other words, the Edgar judge’s officers obtained first-hand knowledge of disputed evidentiary facts at the heart of the case, and that circumstance squarely fits within the requirements for recusal outlined by Judge Wolin in his opinion.
Petitioners’ final attempt to create an unconditional nexus between ex parte communications and recusal lies in a reference to the Code of Judicial Conduct, which cautions against ex parte communications. Code of Conduct for United States Judges, 175 F.R.D. 363, Canon 3(A)(4). However, the Code tellingly leaves out ex parte communications in its listing of grounds for disqualification, refuting Petitioners’ claim that the Code endorses recusal based on ex parte contacts. Id. at Canon 3(C). Furthermore, although the Code was largely codified in 28 U.S.C. § 455, see Ausherman v. Bank of Am. Corp., 216 F.Supp.2d 530, 531 (D.Md.2002), “violations of the Code do not necessarily give rise to a violation of’ that statute. Andrade v. Chojnacki, 338 F.3d 448, 459 (5th Cir.2003). Indeed, as Respondents point out, the fact that Congress codified so much of the Code but did not codify the prohibition on ex parte communications evinces a Congressional judgment that ex parte communications do not warrant recu-sal per se. In short, ex parte communications must give the judge information on a specific disputed material fact gleaned from outside the judiciary process to warrant recusal under § 455(b)(1).[35]
Petitioners fail to show that Judge Wo-lin gained any “personal” knowledge from outside judicial proceedings, as all of the ex parte contacts in this case were conducted within the context of Judge Wolin’s management of the case, as announced in December 2001. Petitioners rely on Judge Wolin’s statement that he learned informa *327 tion that was “extra-judicial,” but Judge Wolin’s opinion rejected the allegation that he learned any information that was “extra-judicial” in the sense prohibited by § 455(b)(1). USG also argues that if the ex parte communications at issue in this case are not deemed extrajudicial, then no ex parte communication can ever justify recusal. USG’s argument is overstated: ex parte contacts are extrajudicial if they are received by a judicial officer in his “personal” capacity, i.e., through first-hand perception of disputed matters such as in Edgar, Put another way, § 455(b)(1) warrants recusal if the judge or an attendant officer could become a direct witness in the case. Because Petitioners cannot demonstrate such circumstances in this case in regard to Judge Wolin, his recusal is not warranted under § 455(b)(1).
II.
Even if I believed that any of Petitioners’ recusal arguments had merit, I would deny Petitioners’ motion as untimely.
A.
Most troubling in this case is the conduct of Petitioners USG and the USG Unsecured Creditors. As the majority recognizes, both of these Petitioners knew of the Advisors’ alleged conflict in January 2002. Furthermore, it is undisputed that all parties knew of the ex parte scheme in December 2001, at the inception of Judge Wolin’s control of the Five Asbestos Cases. It is also undisputed that no motion for recusal was made until October 2003. This Circuit has joined others in imposing a timeliness requirement on recusal motions. E.g., United States v. Rosenberg, 806 F.2d 1169, 1173 (3d Cir.1986). In determining whether a request for recusal is timely, the Court considers the time elapsed between the complained-of conduct and the motion, the timeline of the case between the conduct and the motion, and the effect of recusal on the case going forward. Smith v. Danyo, 585 F.2d 83, 86 (3d Cir.1978); Apple v. Jewish Hosp. and Med. Ctr., 829 F.2d 326, 334 (2d Cir.1987). These factors, taken together, effectively disallow recusal motions by “a litigant with knowledge of circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming.” Smith, 585 F.2d at 86.
USG and the USG Unsecured Creditors perfectly fit the Smith court’s description of the “sneak attack” litigant. Astonishingly, these two Petitioners kept silent about the matters underlying their motions for over 20 months. USG tries to minimize the appearance of delay by observing that Judge Wolin’s December 2001 statement only disclosed that he would “sparingly” resort to ex parte communications, and alleging that it did not know of the actual scope of the ex parte communications until late 2003. As mentioned above, however, the quantity of ex parte communications is irrelevant to USG’s claim: it is undisputed that USG knew that Judge Wolin was (allegedly improperly) engaging in ex parte communications to some extent for almost two years before it brought its motion to recuse, and that is the relevant measure of the time elapsed. USG cites to Edgar, 93 F.3d at 257, but in that case a one-year delay in bringing the recusal motion was justified because the movants had only recently discovered the objectionable qualitative nature of the ex parte contacts at issue.
USG and the USG Unsecured Creditors also try to excuse their delay by arguing that they did not feel empowered to object to the ex parte communications because Judge Wolin announced that all objections would be deemed waived. I do not believe *328 that a responsible attorney would have reasonably reacted to Judge Wolin’s instruction in that manner. First, Judge Wolin’s statement most naturally indicates that under his announced practice, any objections to any particular ex parte communication would be waived, not that parties could not voice their objections to the practice itself. Second, even if USG and the USG Unsecured Creditors felt that their objection would fail before Judge Wolin, attorneys routinely make seemingly futile objections for the purpose of preserving their objection on the record. See Lightning Lube. Inc. v. Witco Corp., 4 F.3d 1153, 1181, n. 16 (3d Cir.1993) (attorney’s failure to object not excused by belief that objection would be futile). Third, even if USG and the USG Unsecured Creditors felt that objection would be futile, they had the available remedy that they have chosen to exercise now, two years later: a motion for recusal. In short, USG and the USG Unsecured Creditors have no colorable excuse for why they did not proceed for more than 20 months with their efforts to recuse Judge Wolin.
The majority seems to recognize that USG and the USG Unsecured Creditors have no excuse for their dilatory conduct, but then proceeds to excuse that conduct anyway on the grounds that USG had no improper motive for its recusal ■ motion. Specifically, the majority observes that the timeliness requirement was crafted largely to prevent parties from trying to recuse a judge once they felt that they were losing their case. The majority then accepts USG’s allegation that the only ruling made by Judge Wolin so far has been in its favor: the aforementioned February 2003 Case Management Order. The majority concludes that, because USG had not yet suffered any adverse ruling, it did not have the fear of losing that lays at the heart of the timeliness requirement, and that there is therefore no need to enforce the timeliness requirement against USG.
Of course, as USG has itself observed in its argument that it suffered prejudice from the ex parte contacts, the District Court eventually refused to enforce that Case Management Order, meaning that, in effect, the District Court ruled against USG’s wishes. USG cannot, on the one hand, claim in support of its recusal argument that it has perceived Judge Wolin’s ex parte contacts as predisposing him against USG, and then on the other hand, claim that Judge Wolin has shown no predisposition against USG to bolster its timeliness claim. In any event, even if USG had not suffered any adverse rulings yet, it does not change the fact that USG has no justification for its delay in bringing its motion to recuse, as well as the fact that the delay to this case that will result from recusal will erase two years of case management. As this Court has previously noted, delay in this case could be catastrophic to many of the constituencies involved, and that issue looms especially large in this timeliness inquiry. Kensing-ton, 353 F.3d at 224-25. Accordingly, I would reject the § 455(a) challenge to Judge Wolin’s ex parte practice on timeliness grounds with respect to USG.[36]
*329 B.
Although I do not find the conduct of the Petitioners in Owens Coming and Grace as clearly inexcusable as that of the Petitioners in USG, I would still find their recusal motions untimely as well. The recusal motion on ex parte grounds is clearly untimely for the reasons stated earlier: namely, that all parties knew of Judge Wolin’s plan for ex parte communications in December 2001. The recusal motion on conflict grounds, however, requires further discussion with respect to the Owens Coming and Grace Petitioners. These Petitioners contend that their motion is timely because they did not actually know of the alleged conflict until September 2003. I agree with the majority that constructive knowledge is not sufficient to trigger timeliness concerns, but that imputed knowledge can sometimes be sufficient. However, I disagree with the majority’s conclusion that we should not impute the Owens Corning and Grace Unsecured Creditors Committees’ knowledge of the alleged conflicts to the Owens Coming and Grace Petitioners.
It is uncontroverted that the firms of Davis Polk & Wardwell and Stroock & Stroock & Lavan, counsels for the Owens Corning and W.R. Grace Unsecured Creditors Committees respectively, learned of the alleged conflicts no later than January 2002. A party, of course, is charged with the knowledge of its counsel. E.g., Veal v. Geraci 23 F.3d 722, 725 (2d Cir.1994). Therefore, both of the Unsecured Creditors Committees knew of the alleged conflicts. The Unsecured Creditors Committees are fiduciaries of all unsecured creditors, including Kens-ington and the Grace Creditors. Woods v. City Nat’l Bank & Trust Co., 312 U.S. 262, 268, 61 S.Ct. 493, 85 L.Ed. 820 (1941); In re Mountain States Power Co., 118 F.2d 405, 407 (3d Cir.1941). Accordingly, notice to the Unsecured Creditors Committees is the equivalent of notice to Kensington and the Grace Creditors. In re Harris Management Co., Inc., 791 F.2d 1412, 1415 (9th Cir.1986) (notice to creditors’ committee constituted notice to individual creditors).
Imputing the Unsecured Creditors Committees’ knowledge to creditors makes sense. As a parallel example, Respondents point out that the Asbestos Claimants Committee is presumed to speak for all claimants; it would be staggeringly onerous to require notice of relevant events to be given to all 200,000 + asbestos claimants rather than the Committee, which represents their collective interest. There is no reason why unsecured creditors should be given any different treatment than their asbestos claimant counterparts; to the contrary, given that in bankruptcy cases creditors within each constituency change on a regular basis, the necessity of using the Unsecured Creditors Committee as a conduit of notice to unsecured creditors is even more manifest. Indeed, the streamlining function of these Committees is largely their reason for existing in the first place. Finally, imputing knowledge from the Committees to individual creditors would safeguard the interests behind the timeliness requirement. In particular, this rule would prevent Creditors Committees from strategically preserving recusal claims by insulating those claims from individual creditors, and would encourage Creditors Committees to execute their duties to creditors more vigilantly.
*330 Kensington and the Grace Creditors cite authority purportedly against this rule, but the cited cases do not contradict the rule of imputing notice. In re Levy, 54 B.R. 805, 806-07 (Bankr.S.D.N.Y.1985), merely states the truism that a Committee represents the collective interest of its members, rather than any member’s individual interest. Kunica v. St Jean Fin., Inc., 63 F.Supp.2d 342, 347 (S.D.N.Y.1999), simply quotes the underlying bankruptcy opinion, which in turn made its decision not to impute notice on the grounds that the notice to the Committee in that case was oral and informal. Kunica v. St. Jean Fin., Inc., 233 B.R. 46, 57 (S.D.N.Y.1999). Here, in contrast, Davis Polk and Stroock received written notice of the alleged conflicts. In In re Masters, Inc., 149 B.R. 289, 292-93 (E.D.NY.1992), Petitioners’ next cited case, the court held that actual notice to individual creditors was required in the specific context of Bankr.R. 9019(a). Finally, Petitioners cite to Maldonado v. Ramirez, 757 F.2d 48 (3d Cir.1985), but that case does not deal with creditors committees at all and is therefore inapposite. In conclusion, Stroock’s and Davis Polk’s knowledge of the alleged conflicts should count as knowledge on the parts of the Grace Creditors and Kensington, and the motion to recuse on conflict grounds is therefore untimely.
It is worth noting that although Judge Wolin has not yet made any significant rulings in Owens Corning or Grace, he was, at the time the recusal petitions were filed, on the cusp of issuing a ruling on the issue of “substantive consolidation.” After much debate, Owens Corning had submitted a reorganization plan that incorporated substantive consolidation, which was opposed by the bank creditors. Under the status quo, the bank creditors would get almost a full return on their credits; on the other hand, under substantive consolidation, the debts of all subsidiaries would be thrown into a single bankruptcy estate with that of Owens Corning, putting the bank creditors on an equal footing with all other creditors of Owens Corning. According to Judge Wolin, the effect of consolidation on the banks would be to eliminate more than $1 billion in debt guaranteed by the Owens Corning subsidiaries. The District Court held a hearing in April 2003 on the substantive consolidation issue, and an opinion was pending on that matter when Kensington asked for Judge Wolin’s recusal. This set of facts and circumstances leads me to two conclusions. First, Kensington had an incentive to seek Judge Wolin’s recusal: in its moving papers, Kensington has indicated its belief that Judge Wolin has implicitly promoted this claimant-friendly plan, and whether Kensington is correct or not, it has clearly shown that it finds Judge Wo-lin to be ill-disposed to its interests.[37] Second, recusal would lead to months if not years of delay in Owens Coming, as it would at the very least require a retrial of the extremely contentious substantive consolidation issue, and threatens to nullify over two years of case management. See Kensington, 353 F.3d at 224, n. 14 (“assigning another judge to the Owens Coming bankruptcy would set the proceedings in Owens Coming back at least one year”). As this Court noted in its earlier opinion, the brunt of this delay falls upon the claimants themselves, who wait for the conclusion of this bankruptcy proceeding *331 for resolution of their claims. See id. at 224, n. 13.
III.
Pursuant to a mandate from this Court, Judge Wolin took admittedly extraordinary measures to manage an unprecedentedly large and complex asbestos bankruptcy proceeding. Although his methods were unconventional, none of them would inspire within the reasonable and informed observer legitimate questions regarding Judge Wolin’s impartiality. I fear that in moving for Judge Wolin’s recusal, Petitioners have employed a guerrilla tactic timed to serve their own economic interests in this case, rather than the interests of justice and judicial integrity. In the end, putting the stamp of judicial approval on this kind of litigious gamesmanship threatens to undermine the integrity of our judicial proceedings far more than any techniques employed by Judge Wolin. I must respectfully dissent.

. The Advisors appointed by Judge Wolin were: 1) William Dreier, a retired New Jersey appellate judge and products liability expert; 2) David Gross, a New Jersey lawyer and mediator who had previously served as counsel for both asbestos plaintiffs and defendants; 3) C. Judson Hamlin, a retired New Jersey Superior Court judge who had managed all asbestos litigation in New Jersey for a number of years; 4) John Keefe, a retired New Jersey appellate judge who had managed all asbestos litigation in New Jersey for a different period of time; and 5) Francis McGovern, a Duke University law professor with his area of expertise in mass tort litigation.

. The majority contends that Hamlin and Judge Wolin implicitly conceded a conflict when they stated that Hamlin would have had to recuse himself from any assignment in the Five Asbestos Cases dealing too closely with G-I. Maj. Op. at 304. A reasonable observer, however, would not view Hamlin’s and Judge Wolin's cautious statement about self-recusal in hypothetical situations as an admission that a structural conflict actually existed, or even that recusal would be mandatory in those hypothetical situations.

. The majority correctly observes that the reasonable person envisioned by § 455(a) is a lay person, not a member of the asbestos bar. However, even if the District Court’s description of the reasonable person was technically wrong, the practical import of this mistake was minimal. As respondents observe, the “reasonable observer” in recusal cases must still have "knowledge of all the facts." In re Kensington Int’l Ltd., 353 F.3d 211, 220 (3d Cir.2003) (emphasis added). Thus, although the reasonable person is a lay person, the observer with which the Court is concerned is a lay person with complete knowledge of the demands and intricacies of asbestos bankruptcy litigation, as well as the actual events that transpired in the District Court.

. Petitioners contend that this account is verified by Dreier’s notes, but Dreier's penmanship makes this impossible to confirm. JA at 3122-35.

. Kensington also cites to Flamm, Judicial Disqualification § 14.1, which in turn cites to state law cases for the proposition that ex parte contacts demand recusal; § 455(b)(1), a federal statute, is clearly not implicated by these citations.

. I would also find Petitioners’ § 455(b)(1) claim untimely. Although no published decision from this Court has decided whether § 455(b) has a timeliness requirement, it is worth noting that almost every other Circuit that has considered the question has implicitly or explicitly recognized such a requirement. Apple, 829 F.2d at 334 (applying requirement to § 455(b) motion); Oglala Sioux Tribe of Pine Ridge Indian Reservation v. Homestake Mining Co., 722 F.2d 1407, 1414 (8th Cir.1983) (same); E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1295 (9th Cir.1992) (same); Summers v. Singletary, 119 F.3d 917, 920-21 (11th Cir.1997) (explicitly rejecting argument that timeliness require *329 ment applies only to § 455(a) motions and not § 455(b) motions); United States v. York, 888 F.2d 1050, 1054-55 (5th Cir.1989) (same).

. As for the Grace Petitioners, Judge Wolin observed that they were also holders of bank debt, and so they might reasonably have feared a fate similar to that anticipated by Kensington in Owens Coming. Furthermore, two of the Grace Petitioners are themselves holders of Owens Coming's bank debt, meaning that they have the same interest in Owens Coming that Kensington does.