# United States Court of Appeals
## For the First Circuit

---

No. 00-1740

UNITED STATES OF AMERICA,

Appellant,

v.

ALFRED CRAVEN,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

---

Before

Selya, Circuit Judge,

Cyr, Senior Circuit Judge,

and Boudin, Circuit Judge.

---

Michael D. Ricciuti, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief, for appellant.

Stephen B. Hrones, with whom Hrones & Garrity was on brief, for appellee.

---

February 6, 2001

---

**SELYA, Circuit Judge.** In this sentencing appeal, the government, qua appellant, protests the district court's reliance, in granting a downward departure for extraordinary presentence rehabilitation, on an ex parte conversation with a court-appointed psychologist. The defendant, Alfred Craven, resists the government's appeal and simultaneously attempts to persuade us that the Supreme Court's recent decision in Apprendi v. New Jersey, 120 S. Ct. 2348 (2000), demands further paring of his sentence. Because Craven has not cross-appealed, his Apprendi-based claim is not properly before us and we refrain from burrowing into its merits. This leaves the government's appeal — an appeal which requires us to consider the district court's authority vel non to engage in ex parte discussions of substantive matters with court-appointed experts. We conclude that the sentencing court erred in undertaking, and then basing its departure decision on, an ex parte communication. Hence, we vacate Craven's sentence and remand for resentencing.

## I.  BACKGROUND

On June 23, 1999, Craven pleaded guilty to nine counts arising from his involvement in a massive marijuana distribution scheme. A series of sentencing hearings ensued. At the first session, held on December 13, 1999, the district court tentatively fixed the guideline sentencing range (GSR) at 235-

293 months, based on an adjusted offense level of thirty-six (including, inter alia, a three-level downward adjustment for acceptance of responsibility under USSG §3E1.1) and a criminal history category of III. Craven then lobbied for a downward departure, asserting that he had turned his life around about a year before his arrest (e.g., he had stopped drinking and using drugs, obtained gainful employment, reconciled with his girlfriend, and begun to act as a parent to his young son). In support, he tendered letters from family and friends corroborating this about-face.

The judge advised the parties that she intended to have an expert "document" Craven's rehabilitation. To this end, she entered an order directing Dr. Laurence Weisman, a psychologist, to conduct a substance abuse evaluation and submit a report. See 18 U.S.C. § 3552(b) (authorizing the sentencing court to order a study of the defendant if additional information is needed). Dr. Weisman interviewed Craven and prepared a report concluding:

> Alfred Craven is a man at a crossroads in his life. From a chaotic and dysfunctional background that lacked warmth, modelling and supervision, he eased into a life of self-destructive drug addiction and criminal activity through which to support the addiction. Through some innate resources and strength, he appears to have made the necessary commitment to self-rehabilitation, sobriety and a productive lifestyle.

-4-

Although he has had no formal treatment, his claims to have lived for over a year as a sober, contributing member of a community, as well as his involvement in a nuclear family as father and partner, bode well for a successful adjustment back to society upon his release from prison. As with any individual attempting to overcome a background of addiction and criminal lifestyle, the prognosis remains guardedly optimistic <u>if</u> the individual participates in a comprehensive, longterm recovery program. Mr. Craven appears to have demonstrated both the willingness and capability which would make him a good candidate to succeed.

Notwithstanding this optimistic prognosis, the government remained skeptical about Craven's purported rehabilitation. To help prove its point, the government produced disciplinary records from the correctional facility in which Craven had been detained pending disposition of the charges against him. These records showed that during a period of slightly less than two years, ending December 10, 1999, Craven had committed no fewer than eighteen disciplinary infractions. These included twice threatening correctional officers, twice flooding his cell, fighting on four occasions, possessing homemade alcohol, refusing to accept a housing assignment, refusing to obey other orders, and causing various disruptions. The records also showed that Craven had admitted to at least eleven of the infractions, including fighting, threatening an officer, and possessing homemade alcohol.

The district court reconvened the disposition hearing on March 10, 2000. At that time, it weighed Dr. Weisman's opinions against Craven's sorry disciplinary record and expressed concern about whether Craven's behavior while in custody "undermine[d] Dr. Weisman's conclusions." Troubled by that seeming paradox, the court gave Craven's lawyer additional time to address the disciplinary violations. The court noted that "in the absence of dealing with [those violations], I can't depart downward."

At the third and final sentencing hearing, held five days later, Craven's counsel did not deal with the paradox. The district court nonetheless made two downward departures. First, it reduced Craven's criminal history category from III to I on the ground that the higher category overstated his criminal past. See USSG §4A1.3, p.s. (authorizing such departures). This step shrank Craven's GSR to 188-235 months. The government has not inveighed against this aspect of Craven's sentence, and we do not discuss it further.

The judge then turned to the issue of extraordinary rehabilitation. She began her explanation by attempting to reconcile Craven's disciplinary infractions with a finding of rehabilitation:

> I had about an hour conversation with
> Dr. Weisman. First, this case began with

the representations made both to [the Probation Department] and to various members of Alfred Craven's family that he had voluntarily and successfully discontinued his use of all alcohol and illicit substances in August of '96. . . .

[S]uccessfully discontinuing all alcohol and illicit substances without any counseling, without any drug treatment, without any efforts to get at the underlying cause, is a very difficult thing and is particularly difficult for someone with the background of Mr. Craven. He had been involved in substance abuse and addictions since age 14, which is a very long time, and . . . his family was, as Dr. Weisman describes, dysfunctional, chaotic. . . .

. . . .

I faxed to [Dr. Weisman] the disciplinary records. I was concerned the last time, because there were extraordinary disciplinary records for pretrial detention. . . .

I asked him if that suggests, then, that this rehabilitation wasn't in good faith. And he said no. He said judges are wrong in believing that . . . rehabilitation . . . is a continuous unilinear, uninterrupted pattern, and that the observations that he had made of Mr. Alfred Craven still are true . . . .

So, he is not at all concerned that these would be problems of accommodation in a prison, that are still consistent with someone who is struggling with a very difficult and very extensive drug addiction. And, in fact, he said to me, it comes from having dealt with drug addiction on your own rather than in a structured situation with counseling, where you're dealing with what the causes are.

Then, invoking USSG §5K2.0, the judge departed downward on the basis of extraordinary rehabilitation. This departure, equivalent to two offense levels, lowered the GSR to 151-188 months. The judge thereupon imposed a sentence at the bottom of the newly-calculated range. The government appeals the sentence pursuant to 18 U.S.C. § 3742(b)(3).

In our ensuing discussion, we first dispose of Craven's Apprendi-based claim. We then address the government's appeal.

## II.  THE DEFENDANT'S NON-APPEAL

Blithely overlooking his failure to cross-appeal, Craven asseverates that the Supreme Court's recent Apprendi decision calls into question the constitutionality of his sentence. His argument goes this way: 21 U.S.C. § 841(b)(1)(D) sets a maximum sentence of five years for controlled substance violations involving marijuana; longer sentences can be imposed only for specific drug quantities; and since the indictment returned against him did not state any specific drug quantity (although he signed a plea agreement that did), no sentence longer than five years is permissible under Apprendi. To rub salt in the resultant wound, Craven further argues that he must be sentenced based on the minimum amount of marijuana contemplated by the statute (250 grams), which, with a criminal history category of I, would yield a maximum sentence of no

longer than six months.  See USSG §2D1.1(c)(17); USSG Ch.5, Pt.
A (sentencing table).

Craven's argument has some problematic aspects.  In the
first place, Apprendi requires that "any fact (other than prior
conviction) that increases the maximum penalty for a crime must
be charged in an indictment . . . ."  120 S. Ct. at 2355.  At
first blush, it is unclear whether drug quantity in this
instance increases the "maximum penalty" permitted by the
statute.  Cf. United States v. Baltas, ___ F.3d ___, ___ (1st
Cir. 2001) [No. 99-1547, slip op. at 26-30] (holding Apprendi
inapplicable in heroin trafficking prosecution, even though drug
quantity not determined by the jury, because district court
sentenced defendant within the statutory maximum); United States
v. Lafreniere, ___ F.3d ___, ___ (1st Cir. 2001) [No. 99-1318,
slip op. at 14-19] (same).  In the second place, an omitted
element of an offense, if not seasonably called to the attention
of the trial court, may well engender plain error review and,
therefore, not automatically require reversal.  E.g., United
States v. Mojica-Baez, 229 F.3d 292, 306-07 (1st Cir. 2000).
The problematic aspects of Craven's thesis would appear to be
particularly acute because he admitted in the plea agreement to
responsibility for 1,000 to 3,000 kilograms of marijuana and the

statutory maximum for distributing 1,000 kilograms or more of marijuana is life imprisonment. See 21 U.S.C. § 841(b)(1)(A).

In all events, we leave these arguments for another day since we lack jurisdiction to decide the merits of Craven's plaint. The district court entered judgment in this case on April 13, 2000. The government filed its appeal on May 8, 2000. Craven had ten days thereafter within which to file notice of a cross-appeal. See Fed. R. App. P. 4(b)(1)(A) (explaining that a defendant's notice of appeal must be filed within ten days of the entry of judgment or the filing of a government notice of appeal, whichever last occurs). Craven did not avail himself of this opportunity. That omission forecloses his Apprendi claim.

To be sure, an appellee may defend the judgment below on any ground made manifest by the record. See Mass. Mut. Life Ins. Co. v. Ludwig, 426 U.S. 479, 481 (1976) ("[I]t is . . . settled that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.") (citation omitted); Olsen v. Correiro, 189 F.3d 52, 58 n.3 (1st Cir. 1999) (indicating that a cross-appeal is not needed "unless a party is trying to expand its rights by modifying the judgment in some fashion"). This paradigm applies

-10-

in criminal cases.  See United States v. Lieberman, 971 F.2d 989, 996 n.5 (3d Cir. 1992).  Nevertheless, a party may not seek to revise the trial court's judgment without first filing a timely notice of appeal.

The Supreme Court limned the basic rule three-quarters of a century ago:

> It is true that a party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought here by the appeal of the adverse party.  In other words, the appellee may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below.

United States v. Am. Ry. Exp. Co., 265 U.S. 425, 435 (1924). The Court reaffirmed the rule in Ludwig, 426 U.S. at 480-81.  It is fully applicable in criminal cases.  E.g., United States v. Neal, 93 F.3d 219, 224 (6th Cir. 1996) (applying the rule to bar non-appealing criminal defendant's effort to seek judgment of acquittal).  Thus, a criminal defendant, qua appellee, may not seek a reduction in his sentence without having filed a cross-appeal.

Craven has two responses to this jurisdictional bar. First, he makes a plea for us to hear his claim based on judicial economy (the fact that the case is already before us on

the government's appeal). Second, he points to cases that treat failure to charge elements of a crime in the indictment as jurisdictional defects that can be raised at any time.

As to Craven's first contention, any appellee could trumpet judicial economy as a reason for allowing him or her to attack a judgment without having filed a notice of appeal. To accept this contention would therefore require us to turn a deaf ear to the Court's unambiguous teachings. We are unwilling to follow this renegade course.

Like a seldom-used ketchup bottle, Craven's second asseveration looks full at a glance, but it is almost impossible to get anything out of it. Craven grounds this asseveration upon statements that, devoid of context, might appear to support his position. E.g., United States v. Foley, 73 F.3d 484, 488 (2d Cir. 1996) ("In a criminal case, a failure of the indictment to charge an offense may be treated as [a] jurisdictional defect, and an appellate court must notice such a flaw even if the issue was raised neither in the district court nor on appeal.") (internal citations and quotation marks omitted), abrogated on other grounds by Salinas v. United States, 522 U.S. 52 (1997). But we have warned before of the perils of wrenching statements in judicial opinions free of their contextual moorings and then attempting to rely on them. E.g., Liberty

Mut. Ins. Co. v. Commercial Union Ins. Co., 978 F.2d 750, 752 (1st Cir. 1992).

So it is here:  in each and every case that Craven cites, the defendant was appealing his sentence.  Thus, the appellate court had jurisdiction to consider the effect of the government's failure to include an element of the offense of conviction in the indictment.  Craven does not proffer a single case, nor do we know of one, in which a court of appeals decided the issue of whether elements were missing from an indictment when the defendant had entered a guilty plea and elected not to appeal his sentence.

To say more on this point would serve no useful purpose.  We hold, without serious question, that we lack jurisdiction to entertain Craven's Apprendi-based claim in this proceeding.

**III.  THE GOVERNMENT'S APPEAL**

Because the federal sentencing guidelines are designed to reduce the incidence of disparities, departures are the exception, not the rule.  United States v. Jackson, 30 F.3d 199, 201 (1st Cir. 1994).  But that does not mean that a rote application of the guidelines always must dictate the dimensions of a defendant's sentence.  A court may impose a sentence outside the GSR whenever the court supportably determines "that

there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission . . . ." 18 U.S.C. § 3553(b); see also USSG §5K2.0 (implementing statute).

Departure decisions are reviewed for abuse of discretion. Koon v. United States, 518 U.S. 81, 96-100 (1996); United States v. Martin, 221 F.3d 52, 55 (1st Cir. 2000). As Koon explains, in deciding whether or not to depart "the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing." 518 U.S. at 98. In turn, the court of appeals must respect the district court's special competence in sentencing matters. Consequently, we afford substantial deference to most departure decisions. E.g., United States v. Bradstreet, 207 F.3d 76, 83-84 (1st Cir. 2000) (deferring to district court's determination that defendant's extraordinary post-sentence rehabilitation warranted a downward departure); United States v. Amirault, 224 F.3d 9, 11-14 (1st Cir. 2000) (affirming upward departure premised on defendant's sexual abuse of sisters-in-law). Respect, however, does not compel blind allegiance. Koon, 518 U.S. at 98; see also United States v. Snyder, 136 F.3d 65, 67-70 (1st Cir. 1998) (vacating downward departure grounded on federal/state sentencing

-14-

disparity).     Were    the    law    otherwise,   appellate   review   of
departure decisions would be an empty exercise.

In this instance, the government argues that the lower
court abused its discretion when it departed downward on the
basis of what it described as Craven's extraordinary presentence
rehabilitation.    The government offers two main theories in
support of this argument.  First, it maintains that the district
court improperly included in the sentencing calculus knowledge
gleaned during its ex parte discussion with Dr. Weisman.
Second, the government maintains that the record in this case,
with  or  without  the  fruits  of  the  forbidden  ex  parte
communication, fails to sustain a reasoned conclusion that
Craven achieved the extraordinary level of rehabilitation
necessary to justify a downward departure. Craven responds that
the ex parte discourse was entirely proper, and that the record
supplies  an  adequate  factual  foundation  for  a  finding  of
extraordinary presentence rehabilitation.

Some prefatory comments are useful to place these
arguments    into    perspective.      Ordinarily,   presentence
rehabilitation is not a permissible ground for departure because
it can be factored adequately into the sentencing equation by an

acceptance-of-responsibility credit.[1]  See USSG §3E1.1, comment.

(n.1(g)) (listing "post-offense rehabilitative efforts (e.g.,

counseling or drug treatment)" as considerations in granting an

acceptance-of-responsibility credit); see also United States v.

Sklar, 920 F.2d 107, 115-16 (1st Cir. 1990).  But a datum that

is taken into account by a guideline nonetheless can form the

basis for a departure if it is "present to an exceptional

degree" or "makes the case different from the ordinary case

where the factor is present."  Koon, 518 U.S. at 96.  In an

appropriate  case,  therefore,  extraordinary  presentence

rehabilitation can ground a downward departure.  United States

v. Whitaker, 152 F.3d 1238, 1240 (10th Cir. 1998); United States

v. Kapitzke, 130 F.3d 820, 823 (8th Cir. 1997); United States v.

Sally, 116 F.3d 76, 80 (3d Cir. 1997); United States v. Brock,

108  F.3d  31,  35  (4th  Cir.  1997);  Sklar,  920  F.2d  at  116.

Withal, downward departures for presentence rehabilitation are

hen's-teeth rare, and our precedent makes clear that such

departures are to be granted sparingly.  See Sklar, 920 F.2d at

116.  "It is only the occasional instance, where time and

circumstances permit and the accused takes full advantage of

---

[1]In this case, the district court gave Craven the maximum
three-level credit for acceptance of responsibility (in addition
to  the  downward  departure  for  extraordinary  presentence
rehabilitation).

both, that will produce rehabilitation so dramatic as to cross the boundary." Id. at 117.

Against this backdrop, we turn to the question, broadly stated, of whether the facts pertaining to Craven's claimed rehabilitation, as supportably found by the district court, qualify under this rubric. In conducting such an inquiry, we use a three-part test. First, we evaluate whether the circumstances cited by the sentencing court are sufficiently unusual to justify the departure. If so, we next inquire into whether those circumstances are adequately documented in the record. If the departure clears these two hurdles, we then measure its reasonableness. See United States v. Dethlefs, 123 F.3d 39, 43-44 (1st Cir. 1997); Sklar, 920 F.2d at 114.

The first two inquiries sometimes overlap and the lines that separate them sometimes blur. This case is a paradigmatic example of that phenomenon: because of the doubts surrounding the propriety of the ex parte communication, the question of whether the set of circumstances relied upon by the district court was legally sufficient to justify a downward departure cannot easily be separated from the question of whether the court's findings rest upon an acceptable evidentiary foundation. Hence, we consider the first two branches of the test in the ensemble.

Precedent provides some guideposts. We have twice before been called upon to assess a defendant's efforts to purge himself of addiction as a ground for a rehabilitation-based departure. On both occasions, we found that the efforts fell short. In Sklar, the defendant, after his arrest, attempted to vanquish his drug addiction by admitting himself to a halfway house and undertaking other rehabilitative measures. 920 F.2d at 114. We nevertheless set aside the sentencing court's downward departure, finding that the defendant's accomplishments, though laudable, were not exceptional enough to support such a hard-to-achieve departure. Id. at 117. Similarly, in United States v. Rushby, 936 F.2d 41 (1st Cir. 1991), we concluded that the defendant's endeavors, including his post-arrest abstinence and his enrollment in a treatment program for substance abuse, did not warrant a rehabilitation-based downward departure. Id. at 42-43. This was so notwithstanding other exemplary behavior on the defendant's part, e.g., attending to family responsibilities and holding gainful employment. See id.

Craven argues here, as he did below, that his case differs materially from our earlier precedents because both Sklar's and Rushby's rehabilitative efforts began post-arrest, whereas he disavowed drugs and alcohol approximately a year

before federal authorities apprehended him.  To drive home the significance of this distinction, Craven notes that other courts have given this sort of sequencing weight in assessing whether a defendant's presentence rehabilitation merits a downward departure.  E.g., United States v. DeShon, 183 F.3d 888, 889 (8th Cir. 1999) (affirming downward departure where defendant had made radical lifestyle changes a year before his indictment); United States v. Workman, 80 F.3d 688, 701 (2d Cir. 1996) (affirming downward departure where defendant had completed military service honorably before his arrest).

We agree that the distinction advocated by Craven may, on occasion, be salient.  Here, however, the circumstances effectively nullify its potential importance.  The reason that timing matters in rehabilitation cases is that a defendant who decides independently to turn his life around likely deserves higher marks than one who undertakes rehabilitation mainly (or at least partially) to gain advantage in imminent criminal proceedings.  See Workman, 80 F.3d at 701 (emphasizing that "rehabilitation was not undertaken at the spur of impending prosecution").  But that rationale is inapplicable here:  the district court warrantably found that Craven knew the government was "at the door" early in 1996, well before he ceased using illicit substances and set out along the path of rehabilitation.

Since Craven knew that he was the target of an investigation prior to commencing his efforts at rehabilitation, the fact that he renounced drugs and alcohol before he was actually arrested does not serve to distinguish his situation from Sklar and Rushby in any meaningful way.

In this case, moreover, Craven's disciplinary record while in pretrial detention casts significant doubt over the advisability of the downward departure. After all, overcoming drug addiction is neither the equivalent of extraordinary rehabilitation nor a guaranteed ticket to a downward departure on that basis. See United States v. Herman, 172 F.3d 205, 209 (2d Cir. 1999) (finding defendant "merely a rehabilitated drug addict, not a rehabilitated criminal"). The touchstone of extraordinary rehabilitation is a fundamental change in attitude. See, e.g., Bradstreet, 207 F.3d at 78-79, 83-84 (affirming downward departure for extraordinary post-sentence rehabilitation on basis of defendant's tutoring other prisoners, teaching adult education classes in prison, serving as prison chaplain's assistant and clerk of prison parenting program, and lecturing in the community on ethical perils in the business world); DeShon, 183 F.3d at 890-92 (affirming downward departure for extraordinary presentence rehabilitation on the basis of defendant's genuine acknowledgment of responsibility for his

crimes and radical alteration of his lifestyle to include attending church four times a week, receiving continuous counseling, and working over seventy hours a week to catch up on bills). Craven's prison record seems inconsistent with a fundamental change in attitude (and, thus, with the high level of rehabilitation essential for a downward departure).[2]

We nevertheless hesitate to say, as a matter of law, that Craven does not qualify for a downward departure. Both Sklar and Rushby predate the Court's decision in Koon, and Koon highlights the desirability of deference to the sentencing court in such fact-sensitive judgments. Thus, although Koon may not have changed the mode of analysis that previously prevailed in departure cases in this circuit, e.g., United States v. Rivera, 994 F.2d 942, 950-52 (1st Cir. 1993); United States v. Diaz-Villafane, 874 F.2d 43, 49-52 (1st Cir. 1989), it added a gloss that gives us pause.

---

[2]The only reported case in which an appellate court has affirmed a downward departure for presentence rehabilitation based solely on overcoming addiction is United States v. Newlon, 212 F.3d 423 (8th Cir. 2000). The Newlon panel authorized a departure where the defendant, prior to his arrest, had spent approximately eighty-five hours in a structured treatment program, his counselor attested to his sincere desire for a cure, and his family noticed a marked improvement in his demeanor. Id. at 424. Newlon is readily distinguishable from the instant case for at least two reasons. First, Newlon's rehabilitation occurred before the authorities zeroed in on him. Second, no factors were present there that belied the claimed existence of a fundamental change in attitude.

-21-

This is a highly ramified question — and one which ought not be addressed on an uncertain record. We think that the course of prudence is for us to leave open the question of whether the circumstances justify a departure until we first answer the closely related question of whether the sentencing court acted on the basis of information that was properly before it. We turn, then, to that inquiry.

The court below departed downward based on two key findings. First, it concluded that Craven, on his own, gave up drugs prior to his arrest and conquered a long-term addiction. Second, it solicited Dr. Weisman's opinion ex parte and, based on that opinion, found that the proliferation of disciplinary violations did not undercut this supposed rehabilitation. The nub of the question, then, is whether the sentencing court erred in undertaking this ex parte contact and premising a critical finding on information received during the ensuing conversation.

What transpired below is not disputed. At the second of Craven's three sentencing hearings, the district judge struggled with the conflicting evidence on rehabilitation. She determined that she could not grant a downward departure without some cogent rationalization of Craven's disciplinary violations:

> [Y]ou have to deal with the record in prison, because . . . I actually haven't seen this in other defendants. . . .

If there's an explanation, I want to hear it.  But you have to deal with this.  This is not – having surfaced this, it can't be ignored. . . .
I have to deal with this and you have to deal with it.  And in the absence of dealing with it, I can't depart downward. . . .

The judge gave defense counsel time to investigate the infractions and to reconcile them, if possible, with the claim of rehabilitation.

At the final sentencing hearing, Craven's lawyer provided no further explanation for the parlous disciplinary record.  The district court nonetheless departed downward for extraordinary presentence rehabilitation based on a one-hour ex parte conversation with Dr. Weisman.  The government made a proper contemporaneous objection to the court's reliance on this ex parte conversation.

On appeal, the government notes that the lawyers were not privy to the court's conversation with the expert; that the substance of the discussion was not placed in the record; and that the government had no opportunity either to cross-examine the expert or to respond to his opinions.  We agree with the government that a sentencing court may not utilize an ex parte conversation with a court-appointed expert as a means to acquire information critical to a sentencing determination and then rely on that information in fashioning the defendant's sentence.  We

conclude, moreover, that the district court's violation of this principle taints the factual basis for the departure decision and leaves us unable to determine whether Craven's efforts to overcome his addiction qualify him for a downward departure. See Martin, 221 F.3d at 58 (ending analysis upon determining that sentencing court relied on forbidden information in departing). We explain our thinking below.

In general, the law frowns upon ex parte communications between judges and court-appointed experts. See Bradley v. Milliken, 620 F.2d 1143, 1158 (6th Cir. 1980) (expressing concern that reports of court-appointed experts were not placed in record or made available to parties); United States v. Green, 544 F.2d 138, 146 n.16 (3d Cir. 1976) ("Generally . . . the court should avoid ex parte communications with anyone associated with the trial, even its own appointed expert."); see generally 29 Charles Alan Wright et al., Federal Practice and Procedure § 6305 (1997 & Supp. 2000) ("[E]x parte communications between the judge and the expert . . . are discouraged."). The reason is obvious: most ex parte contacts between a trial judge and another participant in the proceedings risk harm, and ex parte communications with key witnesses (such as court-appointed experts) are no exception. To the contrary, such ex parte

-24-

contacts can create situations pregnant with problematic possibilities.

Nor is there any convincing reason for exempting communications undertaken in the course of sentencing from this general prohibition. In point of fact, the statutory provision under which the district court recruited Dr. Weisman does not contemplate substantive ex parte communications between the appointer and the appointee. Rather, it requires that the expert file with the court "a written report of the pertinent results of the study," 18 U.S.C. § 3552(b), and the court must ensure that the report is disclosed to the defendant, his counsel, and the prosecutor prior to the disposition hearing, id. § 3552(d). While the statute does not deal explicitly with the procedure to be followed if the court requires information over and above that contained in the original report, it follows logically that the same or equivalent safeguards (i.e., a written response delivered to all parties in advance of sentencing) should obtain. Accord United States v. Blythe, 944 F.2d 356, 360 (7th Cir. 1991) (determining that section 3552(d)'s framework for review by all interested parties applies to an addendum to the presentence report).

We hold, therefore, that if a sentencing court desires additional information from a court-appointed expert, it must

-25-

either (1) make a written request for a supplemental report and provide that supplemental report to the parties in accordance with the procedure described in 18 U.S.C. § 3552(d), or (2) bring the expert into court to be questioned in the presence of the parties.  Such an even-handed approach not only honors what we believe to be the intent of the drafters of section 3552, but also fits neatly with the prevailing view as to how courts should communicate with court-appointed experts on matters of substance.  E.g., Bradley, 620 F.2d at 1158 (opining that "if any experts are employed to advise the district court . . . they shall prepare written reports, copies of which shall become part of the record and shall be made available to all parties or their attorneys"); Green, 544 F.2d at 146 n.16 (observing that the most appropriate way for a court to talk with its appointed expert would be through "an on-the-record conference in chambers or an on-the-record conference call so that counsel for all parties may participate"); Joe S. Cecil & Thomas E. Willging, Court-Appointed Experts:  Defining the Role of Experts Appointed Under Federal Rule of Evidence 706, at 91-92 (1993) ("If the judge and the expert expect to confer in person . . . [r]epresentatives of the parties can be invited to attend the conference or . . . a record of the discussion can be forwarded to the parties.").

The court below acted in a manner inconsistent with this prudential rule and therefore erred. On the record before us, we conclude that the error cannot be deemed harmless.[3] We base this determination on several factors.

First, the ex parte conversation dealt with a substantive sentencing matter (whether Craven's rehabilitation could be considered extraordinary given his prison disciplinary record). Second, the conversation was plainly determinative of the court's decision to depart. Indeed, like a pearl around a grain of sand, the decision anent the proper sentence to be imposed was formed around the impermissible ex parte conversation. Third, since the court sentenced Craven immediately after it revealed that it had spoken with Dr. Weisman ex parte, the government had no realistic opportunity to challenge the expert's conclusions by cross-examination or otherwise. Fourth, and finally, there is no contemporaneous record of the conversation — only the district court's oral summary of its contents — thereby complicating harmless-error review.

---

[3]We hasten to add that not every ex parte contact between a judge and a court-appointed expert automatically will result in reversal. E.g., Green, 544 F.2d at 146. Here, however, the risk of taint runs high: the court relied heavily on its ex parte communication with Dr. Weisman to ground the downward departure.

Let us be perfectly clear. We do not doubt the trial judge's good intentions — but in her zeal to collect all possible information without further delaying the disposition hearing, she went too far. Under the circumstances that obtain here, we cannot permit the tainted departure to stand. The sentence must be vacated and the case remanded for resentencing.

This determination does not end our odyssey. The question remains whether the remand should be to the same or a different judge. Engaging in ex parte communications with court-appointed experts need not inevitably require a judge's disqualification, but such conduct sometimes can lead to that result. See Edgar v. K.L., 93 F.3d 256, 262 (7th Cir. 1996) (per curiam) (ordering disqualification where the ex parte discussions with court-appointed experts touched on the merits of the dispute and were not justified by any exigent circumstances). The Seventh Circuit's rationale applies here. When a judge receives information that does not enter the record, the reliability of that information may not be tested through the adversary process. Id. at 259 (noting that "[o]ff-the-record briefings . . . leave no trace in the record" and "[w]hat information passed to the judge, and how reliable it may have been, are now unknowable"). Moreover, it is difficult, if not impossible, for a judge, no matter how sincere, to purge

that information from her mind — and, equally, to maintain the perception of impartiality.

These concerns crest in the criminal sentencing context. See generally United States v. Tavano, 12 F.3d 301, 305 (1st Cir. 1993) (remarking that "a court must take pains to base sentencing judgments upon reliable and accurate information"). The level of concern is heightened even further where, as in this case, the information gleaned ex parte was incontrovertibly the basis for the sentencing decision. Finally, were we to remand this case for resentencing by the same judge, we believe that it would be surpassingly difficult for her to disregard the guidance that she previously received from Dr. Weisman. For these reasons, we direct that the case be reassigned to a new trier. See United States v. Curran, 926 F.2d 59, 64 (1st Cir. 1991) (remanding to a different judge for resentencing where the sentencing judge considered victim letters that were neither included in record nor made available to the defense); cf. United States v. Berzon, 941 F.2d 8, 20 (1st Cir. 1991) (directing sentencing judge to step aside on remand for resentencing if he had relied on improperly obtained information during original sentencing hearing).

## IV. CONCLUSION

We need go no further. Since Craven did not file a cross-appeal, we lack jurisdiction over his attempted attack on his sentence and do not pass upon its merits. We do have jurisdiction, however, over the government's appeal. In that regard, we annul the downward departure for extraordinary presentence rehabilitation, vacate the sentence, and remand for resentencing before a different judge.

**<u>Vacated and remanded</u>**.