# United States Court of Appeals
## For the First Circuit

No. 11-1283

UNITED STATES,

Appellee,

v.

JOSÉ MANUEL ZAVALA-MARTÍ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

Peter Goldberger, with whom María H. Sandoval and Pamela A. Wilk were on brief, for appellant.
Dina Ávila-Jiménez, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Thomas F. Klumper, Assistant United States Attorney, were on brief, for appellee.

May 13, 2013

**LIPEZ, <u>Circuit Judge</u>**.  Appellant José Manuel Zavala-Martí ("Zavala") challenges the life sentence he received for his role in a large-scale drug operation that sold heroin, crack, cocaine, and marijuana at a public housing project in Yabucoa, Puerto Rico.  The second of forty-seven defendants charged in a ten-count superseding indictment, Zavala pled guilty at the end of the first day of testimony.  He identifies four substantial procedural flaws in his sentencing: (1) the imposition of a general sentence of life imprisonment on all counts when none of the crimes of conviction supported that penalty; (2) the court's reliance on adverse information it received ex parte; (3) the court's failure to explain why it chose the highest point in the Sentencing Guidelines range; and (4) the court's silence on his disparity argument.  We need reach only the first of these asserted problems to conclude that resentencing is necessary.  In light of the resentencing, we also find it advisable to address the ex parte issue.

## I. Background

We sketch here the factual and procedural background of this case, describing only briefly the underlying drug conspiracy while recounting in more detail the sentencing proceedings that are at issue on appeal.

### A. The Drug Trafficking Conspiracy

From at least 2004 through early 2008, Cruz Roberto Ramos-Gonzalez ("Belleza") was running a multi-faceted drug

distribution operation at the Victor Berríos Public Housing Project in Yabucoa, Puerto Rico, as well as in several other locations.[1] Appellant Zavala was a high-level participant in the enterprise, described by one co-defendant as Belleza's "right-hand man" and by another as one of several "lieutenants" in the organization. Appellant and several other co-conspirators served as "administrators" of the drug points and were responsible, inter alia, for enforcing discipline and recruiting other participants. During the two years that appellant participated in the conspiracy, from 2005-2007, the organization distributed about twenty-two kilograms of cocaine, among other drugs.

In August 2007, a federal grand jury returned a seven-count indictment charging forty-four defendants with conspiracy to distribute heroin, cocaine, crack cocaine, and marijuana. Appellant was named in all seven counts and surrendered to federal agents on October 16, 2007. While in prison awaiting trial, appellant and several co-defendants sought to induce a cooperating co-defendant, Harry Smith Delgado-Cañuelas ("Delgado"), to recant testimony he had given to the grand jury. Appellant arranged for more than $5,000 to be wired to Delgado, some deposited directly into his prison commissary account and some delivered through third parties, in exchange for Delgado's signing and tape-recording false

---

[1] We draw the facts from the trial transcript, appellant's admissions at his change-of-plea hearing, his presentence investigation report ("PSR"), and his sentencing hearing.

-3-

statements about the conspiracy. Appellant also allegedly arranged to have a cell phone smuggled to Delgado in the prison so Delgado could receive a call from Belleza, who was at that time a fugitive.

A ten-count superseding indictment was issued in early 2008. Appellant was listed as the second of forty-seven individuals and again was charged in all counts. Briefly described, the indictment alleged a conspiracy, facilitated by the use of firearms, to distribute various quantities of the drugs identified above near a public school and housing project, distribution of each of the narcotics, witness tampering, and bribery. The three witness tampering and bribery charges were severed from the others, and trial on the remaining seven counts began on October 13, 2009 for appellant and five co-defendants. After a two-day jury selection process and one day of testimony, appellant pled guilty, without a plea agreement, to all ten counts of the superseding indictment.

**B. The Charges**

As the counts are central to the sentencing issues that are the basis for this appeal, we describe each of them: (i) conspiring to distribute fifty grams or more of crack cocaine, 500 grams or more of cocaine, 100 grams or more of heroin, and a measurable amount of marijuana within 1,000 feet of a public housing project or public school, in violation of 21 U.S.C. §§ 841(a)(1), 846 and 860 (Count One); (ii) conspiring to possess

-4-

firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) and (o) (Count Two); (iii) aiding and abetting the distribution of 100 grams or more of heroin within 1,000 feet of a public housing project or public school, in violation of 21 U.S.C. §§ 841(a)(1), 860 and 18 U.S.C. § 2 (Count Three); (iv) aiding and abetting in the distribution of fifty grams or more of cocaine base ("crack"), 500 grams or more of cocaine, and a measurable amount of marijuana within 1,000 feet of a public housing project or public school, in violation of 21 U.S.C. §§ 841(a)(1), 860 and 18 U.S.C. § 2 (Counts Four, Five, and Six); (v) conspiring to tamper with a government witness, and aiding and abetting in government witness tampering, in violation of 18 U.S.C. § 1512(b)(1), (k), and 18 U.S.C. § 2 (Counts Seven and Eight); (vi) aiding and abetting in the bribery of a government witness, in violation of 18 U.S.C. §§ 201(b)(3) and 2 (Count Nine); and (vii) forfeiture pursuant to 21 U.S.C. § 853 and Rule 32.2(a) of the Federal Rules of Criminal Procedure (Count Ten).

## C. Sentencing

In his Sentencing Memorandum, appellant proposed a sentence of no more than twelve years' imprisonment. The government responded with a recommended sentence of life in prison. The wide discrepancy was attributable to, inter alia, the parties' differing assessments of appellant's role in the offense, the drug quantity for which he should be held responsible, and the need to

avoid sentencing disparity.  Appellant also argued that he should be sentenced under the Fair Sentencing Act of 2010 ("FSA"), which reduced the maximum statutory penalty for distributing the amount of crack cocaine alleged in the indictment (fifty grams) from life in prison to forty years.  See 21 U.S.C. § 841(b)(1)(A)(iii) (2009); id. § 841(b)(1)(B)(iii) (2011).  In addition, he sought leniency based on his personal circumstances, including his addiction to alcohol and abuse of prescribed medications.

At the sentencing hearing, appellant's counsel reiterated the request for a sentence of twelve years, emphasizing appellant's downward spiral following the tragic death of his brother and his susceptibility at that time to Belleza's bad influence.  Evidence presented to the court showed that appellant had lived a stable, productive life until his younger brother's murder when appellant was in his early twenties.[2]  Appellant's common-law wife, the mother of his two sons, stated that "everything changed" after the brother's murder, which remains an unsolved crime.  Appellant's father reported that his son became "unstable," explaining that he drank too much, became addicted to a prescription drug, and started to associate with the wrong crowd.

---

[2] On the day before appellant's sentencing hearing, his counsel submitted a DVD containing video statements from family members, including his parents, brother, and sister.  The record contains a transcript of the statements that was prepared by a certified court reporter.

Counsel also emphasized that similarly situated defendants in other cases had been offered sentences comparable to appellant's proposed twelve-year term. She further noted that the government had previously offered to recommend a seventeen-year sentence in exchange for a guilty plea. Though appellant rejected that deal, counsel argued that a life sentence was not justified because "[t]he evidence remains the same."

The prosecutor likewise renewed at the hearing the government's request for a life sentence, explaining that even a "conservative" approach to the drug calculation -- considering only the amount of cocaine and not any other drug -- generated a guidelines range of 360 months to life. In response to defense counsel's disparity argument, the prosecutor argued that appellant's situation differed from that of the individuals cited for comparison because, unlike them, appellant had not entered into a plea agreement. The prosecutor emphasized appellant's leadership activities in the conspiracy, as well as his key role in the effort to procure false testimony from Delgado.

The prosecutor also brought up an incident involving appellant that occurred at the prison during his incarceration, separate from the witness tampering activity and after he had been charged in the superseding indictment. Along with two other men (one co-defendant and an unidentified third person), appellant entered an interview room where a probation officer was meeting

with another co-defendant and his attorney and demanded to see the co-defendant's plea agreement.  According to the government, the probation officer and attorney were intimidated by the encounter.

Asserting that appellant had "not shown that anything that has happened to him from all these years will deter him from conducting future criminal acts," the government predicted his likelihood of rehabilitation at "zero to none."  Hence, it recommended the highest guidelines sentence.

Defense counsel responded by again raising the disparity argument, noting, inter alia, that the court had imposed that day a twenty-year term on a similarly situated co-defendant (Defendant No. 4 in the indictment).  Counsel also reported that the attorney involved in the prison episode cited by the government had told her -- contrary to the government's representation -- that he had not felt intimidated.  Finally, she emphasized that appellant had in fact shown a capacity for rehabilitation in the previous twelve to fourteen months and had broken ties to his criminal associates.

In imposing sentence, the district court accepted appellant's contention that he participated in the conspiracy for only twenty-four months.  Accordingly, the court held him accountable for the distribution of about twenty-two kilograms of cocaine.  The court stated that it "took under advisement the issue of the amendments to the Fair Sentencing Act," and explained that it was "not in any way calculating any base offense level based on

any crack cocaine."  The court thus adopted appellant's proposed starting base offense level ("BOL") of 34.  It increased the BOL by two levels because the drug dealing occurred near a protected location, see U.S.S.G. § 2D1.2(a)(1), added another two levels for the possession of firearms, see id. § 2D1.1(b)(1), and two more for obstruction of justice, see id. § 3C1.1.  The court rejected appellant's contention that he should be treated as a supervisor of the drug organization, rather than a leader, and thus added four levels for appellant's role in the offense.  See U.S.S.G. § 3B1.1(a).[3]  Finally, the court granted appellant a two-level downward adjustment for acceptance of responsibility.  See U.S.S.G. § 3E1.1(a).  The resulting BOL was 42, and the applicable criminal history category was I.  As a result, the sentencing guidelines range was 360 months to life imprisonment.

The district court prefaced its sentencing pronouncement with a summary of appellant's criminal conduct, including his position as "the second in command of one of the most dangerous drug trafficking organizations operating in the eastern part of Puerto Rico," his "principal role in the efforts to get the

---

[3]  At appellant's change-of-plea hearing, the court had described appellant's role in the conspiracy as a "supervisor." The prosecutor stated at that hearing that appellant was a supervisor of five or more people and that he "acted as the lieutenant of the place on behalf of the drug trafficking organization."  Under the guidelines, a supervisory role would result in a three-level increase in the BOL rather than the four-level adjustment for a leadership role.  See U.S.S.G. § 3B1.1(b).

-9-

Government's main cooperator to recant his testimony," and his "instrumental" role in smuggling the cell phone to Delgado. The court also cited the episode at the prison involving the probation interview:

> The Court has also received information from the probation office that this defendant along with another co-defendant also attempted to intimidate another U.S. probation officer, who was at the time conducting the presentence interview of a co-defendant in this instant case at MDC Guaynabo.
>
> The defendant interrupted the interview and demanded to see the co-defendant's Plea Agreement, which is confidential and against Bureau of Prisons' rules and regulations, all to verify if said co-defendant was cooperating with the Government.
>
> . . .
>
> Although Counsel says that she interviewed the lawyer involved in the issue with the probation officer, as a result of that incident, it was brought to the attention of the Court. We held a meeting with all the judges present, probation office, where the probation officer who was involved, certainly related to the Court the events that transpired and how she was intimidated at the time she was interviewing another co-defendant who had pled guilty.
>
> Mr. Zavala was accompanied by another co-defendant and another person who was not identified. And he was the main actor of that incident. It shows that he was still exercising his position as leader of the drug trafficking organization, at least of those that were in prison.
>
> So in order to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the

offense, it is the judgment of this Court the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for the remainder of his natural life.

Immediately following the imposition of sentence, defense counsel, noting the court's reliance on the ex parte meeting with the probation officer, asked the court to vacate the sentence so that she could review any written reports or videotapes of that meeting. The judge responded that there was no memorialization of the meeting: "It was just a sit down with the probation officer and that was it. We were given information as to what transpired at that time." Counsel's ensuing request for an opportunity to call the probation officer to the stand was denied.

Near the close of the proceeding, the prosecutor sought to clarify the court's reference to the incident:

> Prosecutor: Counsel . . . [said] that Your Honor expressly used the incident with the probation officer . . . to make a judgment of life imprisonment. And I just want to clarify for the record, that wasn't the only factor, the expressed factor for Your Honor's basis.

> Court: No, no. I expressed it. And if you notice that when the latter part of that statement I said that that shows that he was still exercising his position as leadership while in prison over the other co-defendants in this case that were in prison.
> That's the only reason I brought it forth, to show that he was still a[]head of that group and he was still exercising [a] leadership role.

> Prosecutor: Thank you, Your Honor.

-11-

Court: That's the only reason I brought it up, because I know it doesn't influence the sentence.

The court did not announce a sentence on each count separately, and its subsequent written judgment also recorded the sentence of "[i]mprisonment for the remainder of his natural life" without linking it to individual counts.[4] The forfeiture count, Count Ten, was dismissed.[5] A section of the court's Statement of Reasons filed as part of the judgment, titled "Additional Facts Justifying the Sentence in this Case," stated, in part: "The Court also received information that defendant along with another co-defendant also attempted to intim[id]ate another U.S. Probation

---

[4] The same language appeared in an amended judgment, which added (at appellant's request) to the list of institutions the court recommended to the Bureau of Prisons for appellant's placement.

[5] The Docket entries for the documents titled "Judgment in a Criminal Case" (No. 2579) and "Amended Judgment in a Criminal Case" (No. 2788) do list each count separately and in sequence, grouping the counts with identical supervised release terms and monetary assessments. Counts Three to Six, for example, are recorded as follows:

> Count(s) 3s, 4s, 5s, 6s, Impr for the remainder of his natural life. SRT of 10 years. SMA of $100.00[.]

At both the sentencing hearing and in the Judgments themselves, however, the court imposed an undifferentiated life term. The clerk's entry cannot add substantively to the court's judgment, and the government does not argue otherwise. See generally Fed. R. Crim. P. 32(k)(1) ("In the judgment of conviction, the court must set forth the plea, the jury verdict or the court's findings, the adjudication, and the sentence. . . . The judge must sign the judgment, and the clerk must enter it.").

Officer, who was at the time conducting the pre-sentence interview of a co-defendant in this case at MDC-Guaynabo."

## II.

Appellant attacks his life sentence on four fronts. First, he claims it is impermissible to impose a general sentence rather than giving specific attention to each separate count, and the general sentence is additionally improper here because none of the counts authorizes a term of life imprisonment. Second, he argues that the court committed a due process violation by improperly relying on adverse factual information obtained in the ex parte meeting with the probation officer. Third, appellant asserts that the court erred by failing to explain why it chose to sentence him at the specific point within the guidelines range, as required by statute when the range spans more than twenty-four months. See 18 U.S.C. § 3553(c)(1). Finally, he argues that the court erred by giving no reason for rejecting his disparity argument. As noted above, we reach only the first two of these contentions.

## A. Standard of Review

Claims of sentencing error trigger a two-step inquiry: "we first determine whether the sentence imposed is procedurally reasonable and then determine whether it is substantively reasonable." United States v. Clogston, 662 F.3d 588, 590 (1st Cir. 2011). In evaluating the procedures used, "we review factual

-13-

findings for clear error, arguments that the sentencing court erred in interpreting or applying the guidelines de novo, and judgment calls for abuse of discretion." United States v. Leahy, 668 F.3d 18, 21 (1st Cir. 2012) (citations omitted). The substantive reasonableness of the sentence is reviewed for abuse of discretion, taking into account the totality of the circumstances. Id. at 24.

Although appellant argues that a sentence of life imprisonment is unreasonably harsh, his claims are procedural in nature. Our review thus adheres to the formula set out above for procedural challenges, modified as appropriate for issues subject to the plain error standard. See United States v. Fernández-Hernández, 652 F.3d 56, 71 (1st Cir. 2011) ("'[W]hen a defendant fails to preserve an objection below, the plain error standard supplants the customary standard of review.'" (quoting United States v. Dávila-González, 595 F.3d 42, 47 (1st Cir. 2010) (alteration in original)).

## B. The General Sentence of Life Imprisonment

The government concedes that the imposition of a general sentence of life imprisonment was improper, as no count in the indictment supported such a sentence,[6] and it agrees that

---

[6] The government asserts in its brief that a general sentence is not per se unlawful when the term imposed does not exceed the maximum for one or more counts. The defendant argues that a general sentence is improper regardless of its propriety for discrete counts. We need not enter that debate, as the government concedes that the life sentence imposed here was not authorized for any of the nine counts.

resentencing is necessary on most of the counts.[7]  It argues, however, that the life term should stand on two of the drug counts -- Counts One and Five -- because appellant cannot satisfy the plain error standard with respect to those two counts.  Before examining the competing views of the appropriate remedy for the acknowledged error, we briefly digress to explain the FSA's effect on the case.

### 1. The Fair Sentencing Act of 2010

In Count One of the indictment, appellant was charged with conspiring to possess for distribution 50 grams or more of crack, along with varying quantities of other drugs.  Count Four alleged that he in fact possessed, with the intent to distribute,

---

We note, however, that we have stated that "[t]he proper procedure" is to "render a separate sentence on each count."  See United States v. Moynagh, 566 F.2d 799, 805 (1st Cir. 1977), abrogated on other grounds by United States v. Nieves-Burgos, 62 F.3d 431, 436 (1st Cir. 1995).  Some courts have adopted appellant's view, at least in particular cases.  See, e.g., United States v. Ward, 626 F.3d 179, 184-85 (3d Cir. 2010) (finding plain error and remanding for resentencing where general sentence exceeded the mandatory maximum on some counts); United States v. Moriarty, 429 F.3d 1012, 1025 (11th Cir. 2005) (remanding for resentencing where general sentence exceeded the mandatory maximum on one count because "[i]t is difficult to determine the intention of the district court").

[7] The government agrees that resentencing is necessary on Count Two (twenty-year statutory maximum), Counts Three & Four (eighty-year statutory maximum), Count Six (forty-year statutory maximum), Counts Seven & Eight (twenty-year statutory maximum), and Count Nine (fifteen-year statutory maximum).  Although the government's brief asserted that resentencing on Count Seven was unnecessary, the government acknowledged at oral argument that it had erred in so arguing.

50 grams or more of crack. At the time the indictment was filed, a defendant convicted of a distribution offense involving 50 grams or more of crack was exposed to a maximum statutory term of life imprisonment. By the time appellant was sentenced, however, the FSA had reduced the maximum penalty for that amount of crack to 40 years, and it increased the trigger amount for a life sentence to 280 grams or more. See 21 U.S.C. § 841 (b)(1)(B)(iii), (b)(1)(A)(iii).

As described above, appellant argued in his sentencing memorandum that he was entitled to be sentenced under the FSA, with its reduced penalty for the charged amount of crack. The Supreme Court recently agreed, holding that FSA penalties apply to offenders, such as appellant, who were sentenced after the statute went into effect. See Dorsey v. United States, 132 S. Ct. 2321, 2335-36 (2012). Hence, at the time of appellant's sentencing, the crack cocaine averments in the indictment supported a maximum sentence of forty years, doubled to eighty years because the drug dealing took place in proximity to a school and public housing project. See 21 U.S.C. § 860(a).

As it turned out, the district court explicitly disclaimed reliance on any amount of crack cocaine in imposing sentence and "took under advisement" the impact of the FSA. The government did not object to the court's approach. We thus proceed

-16-

with our analysis without taking into account the crack cocaine allegations.

### 2. Plain Error

Where a defendant fails to present a claim of error to the district court, as is the case with appellant's challenge to the general life term, he must satisfy a demanding four-prong inquiry to obtain relief. To demonstrate reversible plain error, a defendant must show that (1) an error occurred, (2) the error was clear and obvious, and it not only (3) affected the defendant's substantial rights but also (4) "'impaired the fairness, integrity, or public reputation of the judicial proceedings.'" United States v. Mitrano, 658 F.3d 117, 124 (1st Cir. 2011) (quoting United States v. González-Castillo, 562 F.3d 80, 82 (1st Cir. 2009)). The government asserts that, even if appellant can satisfy the first three requirements with respect to Counts One and Five, he cannot satisfy the fourth prong.

As we have described, Count One alleges that appellant conspired to distribute fifty or more grams of cocaine base, 500 grams or more of cocaine, 100 grams or more of heroin, and measurable amounts of marijuana, all within 1,000 feet of a public housing project or public school. Count Five alleges that appellant aided and abetted in the distribution of 500 grams or more of cocaine, also within 1,000 feet of a housing project or public school. The statutory maximum penalty for the crimes

-17-

alleged in the two counts, which is linked to drug quantities, is eighty years. See 21 U.S.C. §§ 841(b)(1)(B), 860 (providing an initial forty years for the specified quantity, doubled because of the proximity to a protected location). The government theorizes, however, that appellant may fairly be sentenced to the statutory maximum that applies to larger quantities of drugs because the court found him responsible for twenty-two kilograms of cocaine. Based on that amount of cocaine, appellant would be subject to a minimum term of ten years and a maximum term of life imprisonment. See 21 U.S.C. § 841(b)(1)(A)(ii).

In advocating for the validity of a sentence based on the twenty-two kilograms, the government relies on the Supreme Court's decision in United States v. Cotton, 535 U.S. 625 (2002). Applying plain error review, the Court in Cotton upheld sentences that were unlawful under Apprendi v. New Jersey, 530 U.S. 466 (2000), because the drug quantities used to calculate the sentence had not been alleged in the governing indictment. Cotton, 535 U.S. at 632. Although the original indictment had alleged a conspiracy to distribute five kilograms or more of cocaine and fifty grams or more of crack -- quantities that exposed the defendants to life imprisonment, id. at 627, 633 n.3 -- the drug amounts were omitted from the superseding indictment as permitted by then-prevailing precedent, id. at 628. Following guilty verdicts, the court imposed sentences of thirty years and life imprisonment based on

-18-

undisputed quantities of crack far in excess of the statutory threshold alleged in the original indictment. Id. The defendants did not object based on the omission of quantity allegations in the indictment.

The Supreme Court held that, in the circumstances of that case, the omission of drug amounts from the superseding indictment "did not seriously affect the fairness, integrity, or public reputation of judicial proceedings." Id. at 632-33. The Court noted the "overwhelming" and "essentially uncontroverted" evidence that the conspiracy involved at least fifty grams of cocaine base, id. at 633 (internal quotation marks omitted), and it concluded that "[s]urely the grand jury, having found that the conspiracy existed, would have also found that the conspiracy involved at least 50 grams of cocaine base," id.

We disagree that Cotton leads to affirmance of the life sentence imposed in this case. In addition to the problematic general nature of the sentence here, a critical distinction between the cases is that the grand jury in Cotton had originally charged a drug quantity consistent with the district court's judgment. The omission of a drug quantity in the superseding indictment did not signify a change in the prosecution's or grand jury's assessment of the case. Rather, it reflected the state of the law at the time, before the Supreme Court held that "'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be

-19-

submitted to a jury'" and charged in the indictment. Id. at 627 (quoting Apprendi, 530 U.S. at 490, 476); see also Brief for the United States, United States v. Cotton, 535 U.S. 625 (2002) (No. 01-687), 2002 WL 264766, at *46 ("[T]here is no reason to suppose that the grand jury meant to retract its earlier findings (which, under the prevailing view of the law, were not required in an indictment)."). In Cotton, therefore, the Court carried out the original charging decision when it rejected the defendants' claim of plain error. Id. at 634; see also United States v. Cotton, 261 F.3d 397, 414 (4th Cir. 2001) (Wilkinson, J., dissenting) (noting that "[t]here can be no doubt that had the prosecution been aware of the [subsequent change in the law], it would have made certain that the superseding indictment mirrored the initial indictment"), rev'd, Cotton, 535 U.S. at 625. Moreover, when they were indicted for a second time, the Cotton defendants, in light of the original indictment, would have understood that the charged conspiracy exposed them to the lengthy sentences ultimately imposed. On appeal, they were seeking to benefit from an unanticipated change in the law.

Here, by contrast, there was no flaw in the indictment resulting from a subsequent change in the law: the grand jury did choose a drug quantity and thereby set specific, statutorily prescribed limits on the sentence. The problem, instead, is that the district court imposed a term of imprisonment that exceeds the

-20-

statutory maximum for the drug quantity selected by the grand jury. As outlined above, the cocaine amount charged in Counts One and Five -- "500 grams or more" -- triggered a sentence under 21 U.S.C. § 841(b)(1)(B)(ii) of "not . . . less than 5 years and not more than 40 years," doubled under § 860 to a maximum of eighty years. Affirming the sentence here would thus reduce the drug-quantity element of the indictment to an irrelevancy. Unlike in Cotton, it would mean disregarding, not carrying out, the grand jury's judgment.[8]

Moreover, the government's position that the life terms should stand on Counts One and Five is incompatible with the procedure needed to correct the unlawful general sentence. Where the district court's obligation is to individually consider the appropriate punishment for each count, it would be unseemly for us to permit -- indeed, to direct -- an unlawful term of life

---

[8] Because the superseding indictment in this case alleged an amount of crack that could have triggered a life sentence at the time the indictment was filed, the case would have borne more of a resemblance to Cotton if the quantity of crack had figured into appellant's sentencing calculus. The district court, however, explicitly excluded crack from consideration in sentencing. Appellant's pre-FSA exposure to a life sentence based on the crack allegations has no relevance to his exposure based on the quantity of regular cocaine.

Counsel's failure to object to the life term appears at least partially attributable to her focus on the Guidelines and the FSA's impact. She stated at the hearing that, even under the FSA, appellant "would still be in a life category." Evidently, neither counsel nor the court realized that life imprisonment exceeded the statutory maximum once the crack was dropped from the sentencing calculus.

-21-

imprisonment on two of the counts. This overriding sentencing flaw did not exist in Cotton.

In these circumstances, we reject the government's assertion that the life term of imprisonment survives the plain error test. Particularly in light of its severity, we conclude that "the fairness and integrity of the criminal justice system," Cotton, 535 U.S. at 634, would be compromised if we were to enforce an unlawful life sentence that the government declined to seek at the outset of the case, when it could have done so lawfully. See Jones v. United States, 526 U.S. 227, 243 n.6 (1999) ("[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.").

We thus conclude that the district court's plain error in imposing a general sentence of life imprisonment on Counts One through Nine of the indictment requires us to vacate that sentence and remand for reconsideration of the sentence on every count. That determination arguably makes it unnecessary for us to consider at this time appellant's other claims of error, which relate to the manner in which the district court handled the original sentencing proceeding. One of those issues warrants our attention, however, to ensure that it does not recur during resentencing. Importantly,

that discussion will demonstrate that the fairness of the original sentencing proceeding was compromised. Hence, the district court will need to consider the appropriate sentence anew, rather than remedying the general sentence problem simply by specifying a term for each count. We therefore turn to the second challenge.

## C. Ex Parte Information

Appellant asserts that the district court erred in fixing his sentence by considering information obtained during an ex parte meeting with the probation department. The record is unclear about the nature of the ex parte gathering and who was present, though the participants apparently included multiple judges and the probation officer involved in the incident in which appellant and two others demanded to see a co-defendant's plea agreement. The record does show that the district court concluded that appellant played the lead role in the encounter, and the court later factored that conclusion into its sentencing decision.

A district court tasked with imposing an appropriate sentence "enjoys 'broad discretion in the information it may receive and consider regarding [a] defendant and his conduct.'" United States v. Rivera-Rodríguez, 489 F.3d 48, 53 (1st Cir. 2007) (alteration in original) (quoting United States v. Curran, 926 F.2d 59, 61 (1st Cir. 1991)); see also 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a

court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). Under Federal Rule of Criminal Procedure 32, however, the court is required to provide the defendant with "'a meaningful opportunity to comment on the factual information on which his or her sentence is based.'" Rivera-Rodríguez, 489 F.3d at 53-54 (quoting United States v. Berzon, 941 F.2d 8, 10 (1st Cir. 1991)); see also Irizarry v. United States, 553 U.S. 708, 715 (2008) ("Sound practice dictates that judges in all cases should make sure that the information provided to the parties in advance of the hearing, and in the hearing itself, has given them an opportunity to confront and debate the relevant [sentencing] issues."); Fed. R. Crim. P. 32(i)(1)(C).[9] The Sentencing Guidelines likewise require that defendants be given "an adequate opportunity" to address "any factor important to the sentencing determination [that] is reasonably in dispute." See U.S.S.G. § 6A1.3(a).

The process here was inadequate. Indeed, the government does not meaningfully argue otherwise, largely confining its briefing on this issue to a harmless error analysis.[10] Appellant

---

[9] Rule 32(i)(1)(C) states that the court "must allow the parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence."

[10] The government makes a listless attempt to justify the ex parte session on the ground that probation officers are "'regarded as an extension of the court who provide[] the sentencing judge with a wide range of information about the defendant and the

-24-

was alerted to the ex parte meeting for the first time during the court's sentencing pronouncement, and he thus had insufficient notice and no opportunity to develop a response to any adverse information communicated there.   See Berzon, 941 F.2d at 18 ("'Th[e] right to be heard has little reality or worth unless one is informed.'" (alteration in original) (quoting Burns v. United States, 501 U.S. 129, 136 (1991) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)))).

Importantly, it appears that defense counsel also first learned at the sentencing hearing that appellant had been depicted as "the main actor" in the prison episode.[11]   That characterization of appellant's role was prominent in the district court's oral

_____

offense.'"  Brief at 50 (quoting United States v. Johnson, 935 F.2d 47, 49 (4th Cir. 1991)).   Here, however, the information communicated ex parte was not from a "neutral, information-gathering agent of the court," Johnson, 935 F.2d at 50, but from a participant in an incident involving the defendant.  The precedent the government invokes is thus wholly inapt here.

[11] So far as the record shows, the first reference to the incident itself was in the government's response to appellant's objections to the presentence report.  Addressing appellant's argument that he was improperly labeled an "enforcer" for the drug trafficking organization, the government stated in a footnote:

> Defendant need not have used a firearm or killed someone in order to be an enforcer. . . . Interestingly so, not having learned his lesson and proving that he was in fact an enforcer, defendant was involved in intimidating a coconspirator, the coconspirator's attorney and a probation officer during the probation officer's PSR interview of a coconspirator in this case.

Dockt. No. 2544, at 3 n.2.

-25-

explanation of the sentence. Both in its initial remarks and later, when the prosecutor attempted to establish that the encounter was not the sole justification for the life sentence, the court invoked the incident as evidence that appellant was "still exercising his position as [a] leader of the drug trafficking organization." The court also cited the incident in its written Statement of Reasons.[12]

Appellant was thus improperly denied an opportunity to respond to unfavorable information considered by the court in sentencing him. As appellant is otherwise entitled to a complete resentencing, we need not examine the government's assertion that the court would have imposed the same sentence regardless of the undisclosed information, and that any such error was therefore harmless.

On remand, if the district court again chooses to consider the information obtained at the meeting in its sentencing determination, appellant must be given notice of what was communicated about his conduct and an opportunity to respond.

---

[12] The record leaves no doubt that the undisclosed information influenced the court's deliberations, whether or not it affected the actual term imposed. We note one respect in which it may have had a direct impact. At appellant's change-of-plea hearing, both the prosecutor and court described appellant as a supervisor of the drug trafficking organization, a role that would have triggered a three-level upward adjustment in his BOL. At sentencing, the court imposed a four-level role-in-the-offense adjustment based on his status as a "leader" of the enterprise. The four-level adjustment had been recommended in appellant's PSR.

## D. Explanation

Appellant's two remaining challenges both concern the district court's failure to explain the sentence it imposed. Appellant contends that the court (1) did not adequately explain its reasons for choosing the highest point of the guidelines range, as required by 18 U.S.C. § 3553(c)(1),[13] and (2) improperly failed to give reasons for rejecting his detailed disparity argument. These were both matters of consequence, particularly given the severity of the sentence imposed. However, having already established the need for resentencing, we decline to examine these contentions.

## III.

We thus hold that the general sentence of life imprisonment imposed on appellant must be vacated because it exceeds the statutory maximum on each of the nine counts. We also must consider whether the remand should be to the same or a different judge, in light of the sentencing judge's improper reliance on ex parte information concerning the prison incident. See United States v. Craven, 239 F.3d 91, 103 (1st Cir. 2001); Berzon, 941 F.2d at 20.

Although the content of the ex parte meeting could be considered in the resentencing if it were disclosed to appellant

_____

[13] Section 3553(c)(1) requires the trial judge to explain its reasons for selecting a sentence at a particular point within a range exceeding twenty-four months.

-27-

and he were given the opportunity to respond, we are concerned that any such follow-up will necessarily occur long after the discussion took place. An accurate recounting of the event may no longer be possible. In addition, the district court's ability to segregate the information it obtained at the meeting would almost certainly be diminished with the passage of time. We previously have noted that it would be "difficult, if not impossible, for a judge, no matter how sincere, to purge [ex parte] information from her mind -- and, equally, to maintain the perception of impartiality." Craven, 239 F.3d at 103. That concern is apropos here. The maximum sentence on some counts remains very high -- 80 years -- and "'both for the judge's own sake, and the appearance of justice,'" we conclude that remand to another judge is advisable. Berzon, 941 F.2d at 20 (quoting Mawson v. United States, 463 F.2d 29, 31 (1st Cir. 1972)).

We therefore vacate appellant's sentence and remand for resentencing before a different judge.

So ordered.